IN THE MATTER OF HUBERT T. JOHNSON, AN ATTORNEY-AT-LAW.

Argued January 23, 1986—Reargued June 5, 1986.
Decided January 30, 1987.

*Robyn M. Hill,* Deputy Ethics Counsel, Argued the cause on behalf of the Office of Attorney Ethics.

*Richard R. Width* argued the cause for respondent (*Lindabury, McCormick and Estabrook,* attorneys).

PER CURIAM.

Acting on a presentment filed by the District V–A Ethics Committee (Essex DEC) and five presentments filed by the District XII Ethics Committee (Union DEC), the Disciplinary Review Board (DRB) determined that respondent, Hubert T. Johnson, had committed numerous ethical infractions. Specifically, the DRB concluded that respondent failed to carry out contracts of employment, in violation of *DR* 7–101(A)(2); that his misconduct demonstrated a pattern of neglect in his handling of clients' legal matters, contrary to *DR* 6–101; and that he kept retainers without performing services therefor, commingled clients' trust funds, and failed to account to his clients as required by *DR* 9–102, all of which reflected adversely on his fitness to practice law. See *DR* 1–102(A)(6). Because these professional delinquencies are alleged to have occurred between 1978 and 1982, respondent's conduct was governed by the precepts set forth in the Disciplinary Rules then in effect,

rather than in the Rules of Professional Conduct, which were adopted on July 12, 1984, to be effective September 10, 1984. See Rule 1:14.

Most notably, the DRB found that in respect of the three charges involving unauthorized use of clients' funds and misappropriation—the Fluker, Mack, and Briggs matters addressed below—there was "no evidence that respondent intentionally or knowingly misappropriated clients' funds," and hence the disbarment rule of *In re Wilson*, 81 *N.J.* 451 (1979), did not obtain. The DRB unanimously concluded that respondent's ethical transgressions warranted his being suspended from the practice of law for three years retroactive to the date of his temporary suspension, December 16, 1982, and that he should not be readmitted until he reimburses the Clients' Security Fund the full amount of $29,501.68 paid out by the Fund to eleven claimants, of which $13,672.94 had been paid back to the Fund by the date of the DRB's Decision and Recommendation.

The Office of Attorney Ethics (OAE) resists the DRB's recommendation of a three-year suspension. It seeks respondent's disbarment, based on "overreaching * * * and, most seriously, multiple instances of post-*Wilson* misappropriation of client trust funds." Our independent review of the record does not satisfy us that there is clear and convincing evidence of respondent's knowing misappropriation of funds held in trust for clients. We therefore accept the DRB's recommendation for discipline short of disbarment.

## I

Because our concern is concentrated on the misappropriation cases, we pause on the complaints that involve failure to carry out contracts of employment, failure to communicate with clients, and conduct amounting to a pattern of negligence—the Ashford, Howell, and Bunn matters—only long enough to record our conclusion that the record demonstrates those infractions, except in the Ashford case, by clear and convincing

evidence. The Ashford matter we see as a fee dispute involving at most a misunderstanding of the terms of the retainer agreement. Respondent has acknowledged that he owes Mrs. Ashford a refund, the prospects of collecting which are remote, at least at this time, in view of respondent's indigency.

## II

The misappropriation cases, three in number, involve respondent's clients Fluker, Mack, and Briggs. We recite the pertinent facts separately.

## A

Respondent represented Runette Fluker, guardian ad litem of Sherri Fluker, an infant, in her claim against one Elton Hill and the City of Newark. The case was settled for a total of $20,000. On November 17, 1980, Judge Margolis entered judgment in favor of Sherri Fluker for $10,901.68, representing the infant's share of the proceeds. The order for judgment required that the infant's share be deposited with the Essex County Surrogate, to be maintained by the Surrogate and the guardian ad litem in an interest bearing account. The City mailed its check for $20,000 payable to respondent and Runette Fluker as guardian ad litem, on January 13, 1981. The check was endorsed and respondent deposited it in his trust account the following day, January 14, 1981.

Respondent did not thereafter deposit the funds with the Surrogate or otherwise bring them under the Surrogate's control. Letters dated November 4, 1982, and November 5, 1982, from Judge Scalera and the Essex County Surrogate respectively, inquiring about the infant's funds went unanswered. On December 9, 1982, Judge Scalera signed an order directing respondent to show cause why he should not be compelled to comply with Judge Margolis's prior order. Thereafter Judge Scalera directed respondent to deliver $10,901.68 to the Surrogate. Respondent failed to comply with that order, wherefore

yet another order was entered, requiring respondent to pay $7500 to the Surrogate by February 17, 1983, on account of the $10,901.68 judgment, which by that time had accumulated an additional $3,208 in interest. Respondent deposited the $7500 on February 22, 1983. On April 6, 1983, Judge Scalera entered a consent judgment against respondent for $6686.68, the monies withheld by respondent, plus interest. Additional interest was to be accrued until the judgment was satisfied. When the ethics complaint was filed on June 1, 1984, the judgment had not yet been paid, but respondent deposited the funds with the Surrogate around September 1984.

## B

Mack, like Fluker, involves funds of an infant. On April 5, 1982, Judge Harth entered judgment in favor of Rahin Mack, an infant, for $7,153. The order required that the funds be deposited with the Essex County Surrogate for the benefit of the infant. Respondent thereafter failed to file guardianship papers, so on October 14, 1982, the Surrogate requested information concerning those documents. Respondent did not comply with the request, nor did he respond to a letter of October 21, 1982, from the then-Division of Ethics and Professional Services (now the Office of Attorney Ethics) asking for an explanation of the failure to file a guardianship complaint and for an accounting of the proceeds of the settlement.

On November 1, 1982, respondent delivered his attorney's check in the amount of $7,153 to the Surrogate for the account of Rahin Mack. The bank returned the check for insufficient funds. An accounting firm's audit of November 5, 1982, disclosed that respondent did not maintain a client ledger book supporting his trust account activity, as required by Rule 1:21-6, nor had he ever deposited the Mack funds into his trust account or disbursed any trust funds for the benefit of Rahin Mack.

## C

Thomas C. Briggs, Jr. retained respondent on April 22, 1978, to commence a guardianship proceeding relating to his father and to file a civil action on behalf of Mr. Briggs, Sr. against the Department of Corrections and the Parole Board. Mr. Briggs, Sr. was at that time confined in the New Jersey State Prison system and experiencing poor health. Respondent prepared a Complaint seeking his appointment as guardian of the person and property of Thomas C. Briggs, Sr., with a renunciation filed by Thomas C. Briggs, Jr. Before respondent could begin to function as guardian, Mr. Briggs, Sr. died.

Thereafter respondent took control of funds of the decedent on deposit in a Trenton bank, as well as a parcel of real estate owned by decedent. His agreement with the Briggs family was that in addition to acting as administrator and attorney for the estate, he would pursue the action against the state agencies for their alleged mistreatment of Mr. Briggs, Sr. There was an agreed retainer of $3500 for services in connection with the estate; the law suit was to be handled on a contingency basis.

Respondent, in his capacity as administrator, withdrew $4,617.16 from the Trenton bank account, the total balance in which was $9,234.33. He used $3500 of the withdrawn funds as his retainer and an additional $600 for reimbursement of expenses. The balance of $517.16 he deposited in an estate checking account. After the estate was audited and the inheritance tax filed, respondent withdrew $4782.87 from the Trenton savings account and deposited it in the estate checking account.

Thereafter, Thomas C. Briggs, Jr. filed an ethics complaint, charging that respondent had not kept him informed of the status and progress of the law suit, had withdrawn funds from the estate for his own use and without court approval, and had failed to make any accounting of the estate funds. The Division of Ethics and Professional Services obtained an audit of the estate accounts, which disclosed that through an error by the bank, two bad checks that had been issued to respondent

for unrelated fees, totalling $1002.00, were incorrectly debited and charged to the estate account rather than to respondent's business account. An inquiry of respondent produced his promise to redeposit or return the $1002.00 to the estate account, but as of the date of the Union DEC hearing in October 1984 the monies had not been refunded. The audit further revealed that respondent did not maintain separate ledger accounts for clients' trust funds, disbursed funds from the estate account and his trust account without any notations of what the disbursements were for, and did not keep any trust ledger page for the Briggs matter.

### III

Respondent acknowledges that he misused clients' funds, that he was out of trust in respect of the Fluker, Mack, and Briggs matters, that he commingled clients' funds, that he failed to account, and that he did not maintain the books and records required by the Disciplinary Rules. He claims, however, that the admitted misuse was entirely unknowing and hence beyond the reach of *In re Wilson, supra,* 81 *N.J.* 451. More particularly, respondent asserts that he was so busy attempting to build a law firm, working over ninety hours per week, seven days a week, often operating on three-hours' sleep and occasionally with no sleep at all, that he "lost control" of his office. He says that the people on his staff on whom he relied to maintain his books and records simply failed to do so—hastening to add that he does not seek to put the blame on them but instead shoulders that burden himself because of his failure to have supervised or instructed his employees.

Perhaps the flavor of respondent's situation can best be appreciated from the following excerpts from his testimony before the Union DEC:

I had lost total control of the office, I was out of trust, I did not know I was out of trust and I had unfortunately permitted other people to run my office, for whom I take the blame for, but I had permitted other people to run my office,

to run my financial affairs and to do everything that was necessary to be done at * * * my law office.

I didn't properly supervise them. And the real reason why I didn't properly supervise them is because during 1980 I tried in excess of 12 criminal cases, federal and state, in New York, New Jersey. During 1981 I tried in excess of 12 criminal cases. During 1980 I had over a 100 interviews at my office, none of which I took consultation fees for. The same thing in 1981, over 100 interviews at the office, none of which I took consultation fees for.

During 1980 I represented six pool defendants, cases that had been pooled out by the State of New Jersey. And I represented those people. And I just thought as a lawyer I have a responsibility to that community not to bill, so I didn't bill the State for that. I'm giving this testimony to say that at all times I was over extended.

\*       \*       \*       \*       \*       \*       \*       \*

Also during 1980, 1981, when these matters should have been taken care of and they weren't taken care of, in early 1982, during any given period of time, I appeared in criminal courts and civil courts on more occasions than there were formal court days, meaning this: If there were, say, 200 court days in the calendar year 1980, I appeared in court more than 200 times, and the same thing with 1981.

\*       \*       \*       \*       \*       \*       \*       \*

[D]uring 1980, 1981, 1982 I never got any more than three hours sleep per night, because I was tied up with this. During that same period of time and during the previous eight years before I was suspended, I never attended a social function by lawyers, doctors or anybody else; I was at work doing what I had indicated to you.

\*       \*       \*       \*       \*       \*       \*       \*

I was negligent, I was out of trust on Fluker and I take full responsibilities for that. My point and my proof will indicate that I had no knowledge that I was out of trust.

As to the parties, during 1979 I hired a law clerk who was in his third year in law school, * * * who was at that time approximately 43 years old. He remained with me up until he passed the bar, * * * up to 1981. [W.G.] I trusted, I still trust. He was my accountant, he was my law clerk, he was my administrator, he kept all my records and all my books.

As I indicated, I haven't involved him in this because it was my responsibility to supervise him, supervise the office. And it's absolutely certain to me that any mistake that he made, it was an honest mistake and he just didn't know any better, and that was my fault because I may not have taken enough time to teach him what he should have known with the responsibilities that I had given to him.

\*       \*       \*       \*       \*       \*       \*       \*

[I]t took me from 1977 up until I was suspended [to build up a practice]. I might add that I went to jail every Sunday, three piece suit. Sunday, I was at somebody's jail; that was part of strategy. I had a client in jail, I'd go see him.

\*     \*     \*     \*     \*     \*     \*     \*

One other thing I'd like to submit to the committee, give you a good example * * *. I have a drawing, show you how consumed I was, by my son, then four, five-years old, which says my daddy is a lawyer, I want to be a lawyer, my daddy works all night. That's how consumed I was.

\*     \*     \*     \*     \*     \*     \*     \*

A good example, counsel mentioned I had a case involving Hugh Winchester, who is written up in "Dirty Money" and also written up in the Wall Street Journal as the biggest schemer, security fraudman in the whole United States. I was with him and although he had gotten me, too—he wrote me a 10,000 dollar bad check; he got me, too—I was with him all day long on my 12th wedding anniversary. I didn't see my wife all day. And there hadn't been one New Year's Day or one Christmas Eve Day where I wasn't in jail.

When in July 1981 respondent concluded that someone had taken about $1800 in cash from his office, he "stopped everyone from dealing with the books" and "took that upon [him]self." If anything, things went from bad to worse. As respondent testified:

Then to show you I don't know what was going on and I was too busy to even keep up with what I was doing, after that date, July, 1981, although I was writing checks on my regular account, in the book itself, which the committee has now, I didn't have time to make the entries and make the deductions. That's how busy I was, too busy for my own good. I didn't make the entries on my regular account and I didn't make the deductions. I just knew vaguely that I had enough money to cover the checks.

\*     \*     \*     \*     \*     \*     \*     \*

At that time I started Xeroxing the books. At that time I didn't have the physical time to make the entries * * * and make the deductions. What I would do is Xerox each check myself and hold it, hoping at a later date to do the proper accounting, which I never did do.

When the misappropriations came to light and the courts and ethics people began to express their respective concerns, respondent found that he could not cope with the demands of a busy practice and at the same time straighten out his now-catastrophic financial condition. He therefore submitted to a voluntary suspension from the practice of law, effective December 1982.

## IV

We have taken the unusual step of quoting at such great length from respondent's own testimony because no amount of paraphrasing could accurately depict the bizarre state of affairs that respondent constructed for himself. Not a word of respondent's recitation is contradicted. The issue is clear-cut but most difficult of resolution: did respondent *knowingly* misappropriate clients' funds.

The OAE contends that respondent "had to know" that the clients' funds were held in trust, because in the Mack case he "issued checks in that matter on his business account," and in the Fluker case he "knew the * * * funds were gone, since he would not respond to any inquiries or directives from either the Surrogate or the trial court * * *." But respondent's calamitous method of doing business is just as reasonable an explanation of the situation (to the extent that any explanation is "reasonable" in these proceedings) as the one the OAE would have us accept, based as it is on the assumption that respondent had any knowledge of what was going on with his accounts. The evidence about respondent's state of mind is no more compelling in the direction of knowledge than it is in the direction of unhealthy ignorance; and before we will disbar on the basis of a lawyer's knowing misappropriation, the evidence of that knowledge must be clear and convincing.

We should add that if in fact the record demonstrated, by the requisite degree of proof, that respondent "had to know" of the misuse of clients' funds, we would not hesitate to disbar. Proving a state of mind—here, knowledge—poses difficulties in the absence of an outright admission. We accept the complementary propositions that an inculpatory statement is not an indispensable ingredient of proof of knowledge, and that circumstantial evidence can add up to the conclusion that a lawyer "knew" or "had to know" that clients' funds were being invaded; but the record before us falls short of the requisite proof in that regard.

We perceive that respondent was either a most evil man—a thief—or he was spectacularly misguided in his all-consuming effort to build a practice at the expense of other considerations—most of them ethical and professional considerations, some of them personal. We reject the first proposition and accept the second. Respondent's intense dedication became his undoing. His tireless industry in the interest of some clients made him a danger to others. The shambles he created in his office has brought him perilously close to the permanent loss of the right to practice, which he worked so hard to earn.

We see the case, then, as involving more—much more—than the simple "shoddy bookkeeping" that called for a public reprimand in *In re Hennessy*, 93 *N.J.* 358 (1983), in which no one charged respondent, whose practice involved "relatively few legal matters at any one time" *id.* at 360, with any misappropriation. *Ibid.* Although we can recall no other ethics case with quite the twists of this one, perhaps *In re Orlando*, 104 *N.J.* 344 (1986), serves to illustrate the principle we invoke today. The record in *Orlando* reflected that "respondent was seriously and inexcusably inattentive to the accounting and bookkeeping details of his voluminous real estate practice," *id.* at 350, but because the proofs did not add up to a knowing misappropriation, the discipline we imposed was the four-and-one-half years that Orlando had served by way of voluntary temporary suspension.

A word of caution is in order. First, we repeat the admonition found in *Orlando* that

> [d]isbarment is mandated for the knowing misappropriation of clients' funds, *In re Wilson, supra*, 81 *N.J.* 451, for combining operating and trust funds in order to pay personal and office expenses, *In re Fleischer*, 102 *N.J.* 440 (1986), and for borrowing from one client's account to make up for a shortfall in another's, *In re Arnold E. Brown*, 102 *N.J.* 512 (1986). [93 *N.J.* at 360.]

*See also In re Skevin*, 104 *N.J.* 476, 487 (1986) (respondent knew of deficit condition of trust account, knew that it had been produced and was being continued by writing checks against

trust accounts that should have remained untouched until used for purposes for which those funds had been entrusted to him; discipline imposed: disbarment).

Second, we do not intend to suggest that henceforth a respondent who just walks away from his fiduciary obligation as safekeeper of client funds can expect this Court to take an indulgent view of any misappropriation. We will view "defensive ignorance" with a jaundiced eye. The intentional and purposeful avoidance of knowing what is going on in one's trust account will not be deemed a shield against proof of what would otherwise be a "knowing misappropriation." There may be semantical inconsistencies, but we are confident that within our ethics system, there is sufficient sophistication to detect the difference between intentional ignorance and legitimate lack of knowledge.

Finally, we retreat not one bit from the principle that "[i]t is no defense for lawyers to design an accounting system that prevents them from knowing whether they are using clients' trust funds." *In re Fleischer*, 102 *N.J.* 440, 447 (1986). Here, however, we are impressed with the absence of clear and convincing proof that respondent in fact "designed" such a system. Rather his delinquencies appear to have resulted from an unwholesome combination of ineptness in respect of office administration and a remarkable absence of equilibrium in balancing his talents and energies with the needs of his clients.

Respondent is suspended from the practice of law for the period going back to the time of his temporary suspension, December 16, 1982, or slightly over four years, and until further Order of this Court. In the event respondent applies to have the suspension vacated, we will then consider the propriety of the DRB's condition for readmission that there be restitution of the balance of the funds paid out by the Clients' Security Fund. At that time we will determine as well any further conditions that respondent will have to fulfill, particu-

larly in respect of his engaging in practice as a sole practitioner.

Respondent is to reimburse the Ethics Financial Committee for any administrative costs.

So ordered.

## ORDER

It is ORDERED that the temporary suspension from the practice of law of HUBERT T. JOHNSON of NEWARK, who was admitted to the practice of law in this state in 1973 and was thereafter suspended on December 16, 1982, shall continue pending the further Order of this Court; and it is further

ORDERED that whether respondent's restoration to the bar should be subject to his complete restitution of the balance of funds paid out by the Clients' Security Fund shall abide the Court's consideration of an appropriate application for restoration; and it is further

ORDERED that respondent is restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that respondent shall continue to comply with all of the requirements of Administrative Guideline No. 23 of the Office of Attorney Ethics governing suspended attorneys; and it is further

ORDERED that respondent shall reimburse the Ethics Financial Committee for administrative costs arising out the prosecution of this matter.

*For suspension*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.