**603 A.2d 12**

IN THE MATTER OF HILTON DAVIS, AN ATTORNEY AT LAW.

Argued September 24, 1991—Decided March 13, 1992.

*John J. Janasie,* Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

*Richard L. Bland, Jr.,* argued the cause for respondent.

PER CURIAM.

The Office of Attorney Ethics (OAE) filed a complaint against respondent, Hilton Davis, charging him with seven

counts of knowing misappropriation of client trust funds. After three days of hearings, the District Ethics Committee (DEC) found that respondent had misappropriated funds, had failed to safeguard client funds, and had commingled personal and client funds, contrary to *Rules of Professional Conduct* 1.15 and 8.4, *DR* 1–102, and *DR* 9–102.[1] On review, the Disciplinary Review Board (DRB) unanimously recommended that respondent be disbarred. We agree that the factual record presents clear and convincing evidence that respondent engaged in knowing misappropriation of client trust funds and that that conduct warrants disbarment under *In re Wilson*, 81 *N.J.* 451, 409 *A.2d* 1153 (1979).

Respondent was admitted to the New Jersey bar in 1970 and began a solo practice in 1972. Prior to this complaint, respondent had received three private reprimands for unethical conduct. On January 3, 1989, this Court temporarily suspended him for misappropriation of funds. To date, six of respondent's former clients have presented claims to the Client Protection Fund (Fund), which paid out $19,900 on behalf of two clients.

## I

The DRB's Decision and Recommendation summarizes the charges against respondent and the relevant evidence:

### The Stark Matter (1988 Misappropriation)

In January 1988, respondent closed his attorney trust account at Midlantic Bank, which contained $1,909.85, and transferred the funds to a new trust account at the same bank. * * * [R]espondent was out of trust by $2,598.28 within three months of opening his new trust account * * *.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

---

[1] We refer to the Disciplinary Rules that governed the conduct of attorneys at the time of some of these occurrences. Effective September 10, 1984, the Rules of Professional Conduct of the American Bar Association, as modified by this Court, govern that conduct. *Rule* 1:15. Those Rules contain provisions equivalent to the Disciplinary Rules involved here.

This shortage resulted from respondent's disbursement to himself by a trust account check in the amount of $2,500.00 claimed as a fee from a client named Starks on February 1, 1988. However, only $500.00 had been deposited in the trust account in behalf of this client. Respondent disbursed this $500.00 sum on March 30, 1988 directly to the client. No deposit for $2,500.00 was ever made to the new trust account in the *Starks* matter. Thus, when respondent disbursed $2,500.00 to himself, he was invading other client funds to cover his fee. The additional $98.28 of the $2,598.28 shortage represents bank charges for which respondent had made no provision.

When asked why he wrote the Starks' fee check, respondent gave the following explanation:

> \*       \*       \*       \*       \*       \*       \*       \*

Q. \* \* \* The $2,500 check was drawn to yourself, captioned Starks. How or why did you write yourself a $2,500 check captioned Starks?

A. To the best of my recollection, I mean sometimes you—you know—you take a stand, and I think this is one of the times that I took one and paid myself the money that she had said that—that I said that she had owed me. You know, in retrospect and in thinking about it all, to the best of my recollection, it is one of the times that we were fighting about money or my fees.

Q. But you only had $1,900, give or take a couple of extra dollars, in that account to begin with.

A. Yeah, but it should have been—that was only the money that transferred over, right? And I couldn't rationalize all of Starks—what I did on Starks because it just got too complicated and too many files are missing. I just can't answer it any better.

> \*       \*       \*       \*       \*       \*       \*       \*

## Misappropriation 1981–1984

In count two of the complaint, respondent was charged with misappropriation, as evidenced by the fact that his trust account was increasingly out of trust from 1981 through 1984. Respondent was also charged in Counts Three through Seven with specific instances of knowing misappropriation during those years.

When respondent was first contacted by the OAE, in 1985, concerning these matters, he hired Anthony Santorelli, Jr. to examine his trust account for the period from 1981 through 1984. In 1985, Santorelli notified respondent that his trust account had been overdrawn for each year examined. The specific shortages were stated as follows:

> December 31, 1981—$3,847.27
> December 31, 1982—$4,663.77
> December 31, 1983—$27,984.99
> December 31, 1984—$30,178.79

In his answer, respondent contended that he was without sufficient information to either admit or deny his accountant's analysis. He also testified that he had contacted all of the clients for whom funds were supposedly due according

to the analysis, and that they all had stated that there were no monies owed to them.

The OAE accountant, William Morrison, testified regarding the bank balances at the conclusion of each year. Although his accounting figures verified Santorelli's, they showed a lesser amount out of trust in December 1983 because he gave respondent credit for a greater amount in fees.

\* \* \* \* \* \* \* \*

Respondent received warning from his bank of these trust account problems during the years 1981–1984. Indeed, as noted by Morrison, on two occasions, June 14, 1983 and March 9, 1984, the trust account was overdrawn. An overdraft charge was assessed against the account and recorded in the bank statement. Furthermore, seven trust account checks were returned for insufficient funds, two of which were checks drafted to respondent, personally. A separate $16 item charge for each of these returns was listed on the bank statements.

Respondent testified that he tried to reconcile his bank statements on a yearly basis and that, at a minimum, he did look at the bank statements on a monthly basis.

\* \* \* \* \* \* \* \*

Finally, respondent acknowledged that his type of trust account lumped all client accounts together, so that if the account was overdrawn, all of his clients' trust funds were missing. Therefore, for the two months that his trust account was overdrawn, he had to know that all of his clients' funds had been invaded.

\* \* \* \* \* \* \* \*

### Misappropriation due to home refinancing

In 1983, respondent refinanced his home in order to pay off two IRS tax liens totalling $56,383.14. Although respondent had hired an attorney to handle the refinancing, in fact respondent himself sent three loan request letters to the bank and personally wrote the trust account disbursement checks after depositing the bank loan into his own trust account.

After respondent had paid off the prior mortgage and the closing costs of the refinancing from the loan proceeds, the IRS tax liens exceeded the total of the new loan proceeds by $13,407.50. He testified that he borrowed money from his brother-in-law to make up the difference, but admitted that no deposit from outside sources was reflected on the trust account bank statement. Respondent had deposited his own personal check for $5,000 at the same time that he deposited the bank loan proceeds, but that personal check was returned for insufficient funds. On September 20, 1983, respondent nonetheless issued two checks from his attorney trust account to the IRS to satisfy the tax liens, thereby invading client trust funds for his own benefit, in the amount of $13,407.50. The OAE contends that, because respondent handled all the loan funds and personally wrote the disbursement checks, which exceeded the

available loan funds by over $13,000, he had to know at that point that he was invading client funds.

\*   \*   \*   \*   \*   \*   \*   \*

## The WNJR Radio Loan

Respondent prepared legal matters for WNJR, a radio station. Mr. Robinson, the chairman of the station's board and majority stockholder, testified that, by 1983, the station owed respondent between $10,000 and $15,000 in legal fees. However, respondent did not bill the station for the fee. On January 11, 1983, he received a check in the amount of $5,000 with the notation that it was a thirty-day loan. Although respondent never placed this loan into his trust account, on March 1, 1983, he issued a trust account check for $5,000 to WNJR, thereby invading client funds to pay back the personal loan. Respondent was charged with misappropriation of $5,000 in client funds.

In his answer to this count, respondent contended that the money from WNJR was not a loan, but an advance on work to be done, which advance he returned to the client when the work was not done. At the committee hearing, respondent changed his answer, stating that the money was for work already done and that he had forgotten that accomplishment because of his alcoholism, until Robinson testified. Respondent alleged, as an affirmative defense, that he inadvertently wrote the check to WNJR against his trust account, instead of against his business account.

\*   \*   \*   \*   \*   \*   \*   \*

## The H.J. Matter

On February 21, 1983, respondent issued a trust account check for $500. This money was given to help another attorney who needed to raise funds quickly to pay a debt. [At the committee hearing, respondent was engaged in the following colloquy:]

\*   \*   \*   \*   \*   \*   \*   \*

Q. Had Mr. [J] given you $500 to be placed into your trust account?

A. Mr. [J] had not given me—had not given me $500, and I—we all knew, quote, unquote, that Mr. [J] was going to give the money back, but I didn't even think when I gave the check in terms of—I thought in terms of Mr. [J] and his problem, not in terms of where the check was coming from or what have you.

\*   \*   \*   \*   \*   \*   \*   \*

Q. Was your intent to borrow $500 of somebody else's, a client of yours [sic] money in the trust account, with the intent of replacing it when Mr. [J] made good on his—

Q. I just don't recall it, and I did not think of it in terms of borrowing money from any account, but giving [Mr. J.]—whether it was from my own account, I just didn't think about it to tell you the truth.

### Advancement of Legal Fees

Respondent disbursed funds to himself from his trust account in advance of either earning or depositing to his trust account corresponding fees from clients on seven occasions, between August 26, 1981 and November 14, 1983.  * * *

\*       \*       \*       \*       \*       \*       \*       \*

Indeed, as of March of 1983, respondent was out of trust by nearly $2,500 based on these advance disbursements alone. Although respondent admits that he left fees in his trust account, he denied that he did so deliberately to replenish client funds that he had knowingly misappropriated when he advanced funds to himself. During this same time period, and specifically on August 12, 1983, respondent disbursed $600 to a client, Harriet Coleman, together with a $300 fee to himself, twenty-six days before he deposited the covering funds. Similarly, on August 22, 1983, respondent issued another $1,100 fee to himself in the *Deakias* matter, twenty-one days prior to the deposit of the related settlement proceeds.

Respondent testified that this occurred because, while he was on vacation, his secretary did not deposit the settlement proceeds, as requested. However, respondent voided two checks in the amount of $400 payable to his client, Mary Jenkins, between August 1983 and January 1984. He did not remit the settlement proceeds to her until February 9, 1984, giving rise to the presumption that he knew his trust account could not cover that disbursement, when he wrote the August and January checks.

The OAE charged that respondent had demonstrated a pattern of using client money to advance funds to himself and deliberately leaving subsequent fees in the trust account to replenish those earlier disbursements.

The committee found advancement of legal fees in 1983 only * * *. The committee considered the proofs to be insufficient with regard to the charge of advancement of fees in 1981 and 1982.

### Misappropriation from the Bauknight Estate

There are three distinct aspects to this count. First, respondent owes the Bauknight estate approximately $10,000 for monies received but never deposited to his trust account. On January 22, 1982, Paul Bauknight, the executor of Nora Bauknight's estate, closed her checking account and drafted a check for the $10,796.45 balance to respondent. There is no evidence that respondent ever deposited those funds in his trust account. In a letter to Paul Bauknight, dated September 12, 1986, respondent acknowledged that he owed approximately $8000 and indicated that he would pay $4000 in three months and the

balance three months later. At the committee hearing, respondent was questioned on why he had not returned these funds:

Q. * * * How or why could you not pay him back his eight to $10,000 if it was in a separate bank account for Bauknight exclusively?

A. At that time and place I could have.

Q. Why didn't you? If you can answer it.

A. * * * I could have and, retrospectively, I should have, but I didn't. I didn't.

Q. * * * you admitted in 1986 to Paul Bauknight that you owed him?

A. Yes.

Q. You could have paid it back in 1986?

A. Absolutely.

Q. You could have paid it back in 1987?

A. Absolutely.

Q. You could have paid it back up until January 3, 1989?

A. Absolutely.

Q. But for that period of time, you didn't pay him a cent?

A. That's right.

Respondent claims that the $8,000 he admits owing is still intact, having been placed in a separate trust account, mislabelled the "Nesbitt" account. However, respondent failed to provide any evidence to the DRB that the funds in the Nesbitt account belong to the Bauknight estate. Moreover, respondent's claim that the Bauknight funds had always been kept in a separate account is contradicted by his own actions. Respondent made two payments to the New Jersey Inheritance Tax Bureau, and also paid his own fees, out of his regular trust account, thus creating a strong presumption that no separate Bauknight account ever existed. Asked to explain that at the DEC hearing, respondent testified that he had mistakenly disbursed the funds from his regular trust account.

In the second instance, respondent made disbursements from his trust account on behalf of the Bauknight estate at times when no Bauknight funds had been deposited in his trust account. In March 1983, respondent issued two checks, the first for $3,255.66 and the second for $578.87, from his trust account to pay the New Jersey Inheritance Tax Bureau on behalf of the Bauknight estate. The first check was returned

for insufficient funds (the DRB assumed that that check was later resubmitted and cashed from Bauknight funds). On April 1, 1983, respondent wrote himself a check for $2500 for legal fees in the Bauknight matter. As no Bauknight funds were on deposit in respondent's trust account before April 6, 1983, those disbursements resulted in the invasion of other clients' funds.

Third, the respondent's trust account is out of trust with respect to the Bauknight funds actually deposited therein. On April 6, 1983, respondent deposited $29,556.80 to his trust account on behalf of the Bauknight estate. Prior to that deposit, respondent had already disbursed a total of $6,334.53 to pay the inheritance tax and his own legal fees. During April 1983, respondent disbursed $17,014.46 of the Bauknight funds to pay the estate's bills. Thus, by the end of April 1983, respondent should have held $6,207.81 ($29,556.80 minus $6,334.53 minus $17,014.46) for the Bauknight estate in his trust account. However, the balance was reduced to ($106.81) by June 1983 without any further disbursements having been recorded.

Therefore, we find that respondent misappropriated $6,207.81 in trust funds that should have been held for the estate since the end of April 1983 and that he also misappropriated the check for $10,796.45 received from Paul Bauknight in 1982. Respondent admits that he owes the Bauknight estate $8000 from Paul Bauknight's check and that he knowingly failed to repay that money for more than five years—despite a written promise to the contrary.

The DRB agreed with the DEC's determination that seven counts of knowing misappropriation were clearly and convincingly proven. After conducting an independent review of the record, we are convinced that the DRB correctly found that respondent knowingly misappropriated client funds in all seven counts.

## II

This Court defines knowing misappropriation as "any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *In re Wilson, supra,* 81 *N.J.* at 455 n. 1, 409 *A.*2d 1153. In *Wilson,* the Court announced that "disbarment is the only appropriate discipline" for knowing misappropriation of client funds and that its imposition would be "almost invariable." *Id.* at 453, 409 *A.*2d 1153. As the Court has since clarified, the attorney's state of mind or motives are largely irrelevant: "it is the mere act of taking your client's money knowing that you have no authority to do so that requires disbarment." *In re Noonan,* 102 *N.J.* 157, 160, 506 *A.*2d 722 (1986).

Knowing misappropriation must be proven by clear and convincing evidence. *In re Konopka,* 126 *N.J.* 225, 228, 596 *A.*2d 733 (1991); *In re Perez,* 104 *N.J.* 316, 324, 517 *A.*2d 123 (1986). Our prior cases clearly establish that shoddy bookkeeping alone does not suffice for a finding of knowing misappropriation. *See Konopka, supra,* 126 *N.J.* at 228, 596 *A.*2d 733; *In re Gallo,* 117 *N.J.* 365, 372–73, 568 *A.*2d 522 (1989); *In re Simeone,* 108 *N.J.* 515, 521–22, 531 *A.*2d 729 (1987); *In re Orlando,* 104 *N.J.* 344, 350, 517 *A.*2d 139 (1986); *In re Fleischer,* 102 *N.J.* 440, 447, 508 *A.*2d 1115 (1986). Although an attorney's records may reveal repeated and frequent instances of being out of trust, that circumstance does not necessarily constitute *knowing* misappropriation. *Konopka, supra,* 126 *N.J.* at 228, 596 *A.*2d 733. Poor accounting procedures, however, "are no excuse for using client's funds. * * * It is no defense for lawyers to design an accounting system that prevents them from knowing whether they are using clients' trust funds. Lawyers have a duty to assure that their accounting practices are sufficient to prevent misappropriation of trust funds." *Fleischer, supra,* 102 *N.J.* at 447, 508 *A.*2d 1115. In

this case, the record provides clear and convincing evidence that respondent's recurrent out-of-trust situations were the product of knowing misappropriation.

The Court has held that "circumstantial evidence can add up to the conclusion that a lawyer 'knew' or 'had to know' that clients' funds were being invaded." *In re Johnson,* 105 *N.J.* 249, 258, 520 *A.*2d 3 (1987). The circumstantial evidence in this case is overwhelming. The obvious absence of deposits in the trust account to cover the $500 disbursement in the *H.J.* matter and the $2500 payment of fees in the *Starks* matter meant that respondent "had to know that an unauthorized withdrawal from a commingled account was occurring." *In re Skevin,* 104 *N.J.* 476, 485, 517 *A.*2d 852 (1986). Moreover, respondent refinanced his home in 1983 in order to satisfy two separate IRS tax liens. All deposits and withdrawals relating to that refinancing were recorded in respondent's trust account. Although he received net proceeds from the refinancing in the amount of $43,470.44, he disbursed amounts from his trust account that exceeded those proceeds by $13,470.50. The conclusion is inescapable that he was using client trust funds for his own purposes, as he had none of his own funds to cover the excess.

In addition, respondent's premature disbursement of funds to both clients and himself resulted in the deficit as of December 31, 1983. During that period, he often received trust account checks returned by the bank for "not sufficient funds," as well as overdraft notices. Some of the checks returned were made payable to respondent himself. These had to alert him to the fact that no funds existed in the trust account to cover the checks, and that he had invaded and was continuing to invade trust funds. We have found knowing misappropriation when an attorney took advance fees out of his clients' trust account before the corresponding deposits had been made to that account. *In re Warhaftig,* 106 *N.J.* 529, 533–36, 524 *A.*2d 398 (1987).

### III

Respondent denies any knowing misappropriation of clients' funds and proffers two main affirmative defenses and mitigating factors. First, respondent argues that any misappropriation was caused by his ignorance about bookkeeping and attorney's ethics. He states that he infrequently performed annual reconciliations of his bank statement and that he could not afford a bookkeeper. At the DRB hearing, respondent's attorney, Richard Bland, made the following arguments:

MR. BLAND: I'm asking the Board to consider recordkeeping so bad or non-existent recordkeeping as substantiated by the fact that [respondent's one-time bookkeeper] does not come into the picture until 1984, 1985. * * * Mr. Davis had no accounting system, had none whatsoever. * * *

CHAIRMAN TROMBADORE: And in 1988 he had the benefit of those audits. He had his own audit, he knew exactly what was required of him. He had been told. He opened a new account to make sure this wouldn't happen again and then you say because of that same old pattern of confusion he paid out $2,500 without regard to where it came from.

MR. BLAND: Mr. Chairman, yes. * * * I would submit to the Board that he, Mr. Davis, would have to be totally insane to write a $500 check [to H.J.] knowing that * * * he did not receive $500 from [H.J.] to give him that money.

MR. HYMERLING: Can you point to anything specific in the record as to a reasonable basis for Mr. Davis' belief that * * * he had enough accumulated fees to cover the $2,500 [in the *Starks* matter] and cover the $500 [in the *H.J.* matter]?

MR. BLAND: * * * No, I cannot. Mr. Davis and I have tried * * * to seek to establish our basis, our belief that the monies in trust were Mr. Davis' earned fees * * *

We thus find unavailing the defense that respondent was ignorant of bookkeeping and the ethical duties imposed by *RPC* 1.15. After the OAE contacted respondent in 1985 about problems with his trust account, he hired a bookkeeper to examine the account for the period from 1981 through 1984. The bookkeeper informed him that the account had been increasingly out of trust, with a shortage of approximately $30,-000 occurring at the end of 1984. In addition, an OAE accountant began auditing respondent in May 1986. Yet, respondent continued to misappropriate client funds after he had been placed on notice about his egregious bookkeeping. Given that, we can only conclude that the misappropriation from Starks in

1988 and from the Bauknight estate were either knowing misappropriations or at the very least the product of "willful" ignorance. In *Johnson, supra,* 105 *N.J.* at 260, 520 *A.*2d 3, this Court stated its intent to "view 'defensive ignorance' with a jaundiced eye. The intentional and purposeful avoidance of knowing what is going on in one's trust account will not be deemed a shield against proof of what would otherwise be a 'knowing misappropriation.'"

■ Respondent also raises the affirmative defense that he was suffering from alcoholism throughout the 1980s. At the DEC hearing, a neurologist, Dr. Alan Clark, testified that he first treated respondent for alcohol-related disorders in the spring of 1988. Respondent was hospitalized for detoxification in January 1989. That alcoholism apparently contributed to respondent's divorce and an estrangement from his grown children.

Respondent failed to adduce any evidence of his alcoholism in the period between 1981 and 1984, during which time most of these misappropriations occurred. Moreover, Dr. Clark acknowledged that respondent's condition was typified by "periodic, specific areas of dysfunction that may occur for an hour to weeks, intermixed with time when the person is able to function." Despite his alcoholism, respondent remained capable of performing complex business transactions, as evidenced by the refinancing of his home and repayment of the IRS liens in 1983.

In *In re Hein,* 104 *N.J.* 297, 516 *A.*2d 1105 (1986), we held that an attorney's alcoholism, although responsible for his misappropriation of client funds, did not justify a departure from *Wilson* 's strict rule. Here, as in *Hein,* we find that the respondent has not proved that his alcoholism prevented him from forming the requisite intent for knowing misappropriation. *See id.* at 303, 516 *A.*2d 1105. We conclude that alcoholism did not prevent respondent from distinguishing between knowing and unknowing misappropriation. We also note that respondent continued to attend to the duties of his practice until his temporary suspension. Although respondent is now under-

going successful rehabilitation, that fact does not constitute a sufficient mitigating factor to outweigh the presumptive disbarment required by *Wilson.*

[T]he rehabilitated alcoholic or addict * * * has presumably recovered from the condition that contributed to cause his clients harm, and he will probably never again do any harm. But many of the lawyers, nonalcoholic, nonaddicted, disbarred by us for misappropriation would probably never again misappropriate. * * * Yet, we disbar. That individual harshness—and so it is in most cases—is justified only if we are right about the devastating effect misappropriation * * * has on the public's confidence in the Bar and in this Court. [*Hein, supra,* 104 *N.J.* at 304, 516 *A.*2d 1105.]

*See In re Canfield,* 104 *N.J.* 314, 516 *A.*2d 1114 (1986); *In re Monaghan,* 104 *N.J.* 312, 516 *A.*2d 1113 (1986); *see also In re Steinhoff,* 114 *N.J.* 268, 553 *A.*2d 1349 (1989) (drug dependency is not sufficient mitigating factor); *In re Nitti,* 110 *N.J.* 321, 541 *A.*2d 217 (1988) (compulsive gambling is not sufficient mitigating factor); *In re Skevin, supra,* 104 *N.J.* at 489, 517 *A.*2d 852 (family hardship is not sufficient mitigating factor). We find insufficient evidence in this record to demonstrate that respondent's alcoholism during the relevant period overwhelmed his mental and emotional capacities to so great an extent as to excuse his flagrant acts of misappropriation.

The charges brought against respondent are substantiated by clear and convincing evidence. Because this case involves knowing misappropriation of clients' funds and there are no mitigating circumstances or affirmative defenses, we are bound by the *Wilson* rule to disbar respondent. Finally, this case evinces a pervasive pattern of knowing misappropriation over several years, thus reinforcing our sense that disbarment is the only appropriate discipline. *See In re Katz,* 90 *N.J.* 272, 284, 447 *A.*2d 916 (1982); *In re Fusciello,* 81 *N.J.* 307, 310, 406 *A.*2d 1316 (1979). We direct further that respondent reimburse the Ethics Financial Committee for appropriate administrative costs.

## ORDER

It is ORDERED that HILTON DAVIS of NEWARK, who was admitted to the bar of this State in 1970, be disbarred and

that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that HILTON DAVIS be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that HILTON DAVIS comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with disbarred attorneys; and it is further

ORDERED that HILTON DAVIS reimburse the Ethics Financial Committee for appropriate administrative costs.

*For disbarment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.