733 A.2d 1174

IN THE MATTER OF ANTHONY J. CAVUTO,
AN ATTORNEY AT LAW.

Argued March 1, 1999—Decided July 30, 1999.

186

*Nitza I. Blasini,* Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Dominic J. Aprile* argued the cause for respondent (*Bathgate, Wegener & Wolf,* attorneys).

PER CURIAM.

This is an attorney-disciplinary case. The Office of Attorney Ethics (OAE) filed a complaint against respondent, Anthony J. Cavuto, charging him with the knowing misappropriation of client funds, in violation of *RPC* 1.15(a); failure to safeguard client funds, in violation of *RPC* 1.15(a); conduct involving dishonesty, fraud, deceit or misrepresentation, in violation of *RPC* 8.4(c); failure to maintain proper records, in violation of *RPC* 1.15(a) and *R.* 1:21–6(b); and commingling personal and trust funds, in violation of *RPC* 1.15(a). The matter was presented to the District IIIB Ethics Committee (DEC), which recommended that discipline be imposed.

The matter is before this Court based on the decision of the Disciplinary Review Board (DRB) determining that respondent was guilty of unethical conduct and recommending that the respondent be disbarred.

I

We determine the facts based upon an independent and *de novo* review of the record. *R.* 1:20–16.

Respondent was admitted to the New Jersey bar in 1966. Respondent represented Curtis Bayne in a personal injury action arising out of a motorcycle accident. The matter was settled for $36,000 and the settlement proceeds deposited in respondent's trust account on May 9, 1986. Under the terms of the settlement, after certain deductions, Bayne was to receive $10,022.14; respon-

dent's fee was $12,000. The settlement provided that respondent pay Bayne's health care providers, whose medical bills totalled $12,727.86.

Respondent issued two checks totalling $10,022 to Bayne on May 17, 1986. Respondent's records showed that after depositing the *Bayne* settlement funds, he wrote numerous checks to himself. The total amount of those checks was $26,259, *viz:*

| Date | Amount | Date | Amount |
|------|--------|------|--------|
| 5/09/86 | 300 | 6/10/86 | 1000 |
| 6/10/86 | 1000 | 6/12/86 | 500 |
| 5/14/86 | 7450 | 6/24/86 | 2000 |
| 5/21/86 | 1000 | 6/26/86 | 500 |
| 5/27/86 | 1000 | 7/09/86 | 500 |
| 5/29/86 | 800 | 7/09/86 | 500 |
| 6/01/86 | 559 | 7/11/86 | 1000 |
| 6/02/86 | 1000 | 7/15/86 | 600 |
| 6/03/86 | 1200 | 7/21/86 | 500 |
| 6/06/86 | 3000 | 7/24/86 | 400 |
| 6/06/86 | 2000 | 7/31/86 | 200 |

Thus, within a short time of distributing the settlement funds to his client, respondent invaded the funds that were escrowed for payment of medical expenses. By July 31, 1986, only $1136.21 remained in respondent's trust account instead of the $12,727.87 that should have been available to pay Bayne's medical bills. Respondent did not pay any of those medical bills.

This situation came to light over five years after the settlement, when Bayne sought treatment from Dr. Elizabeth Post. Dr. Post refused to see Bayne because she still had not been compensated for the medical expenses incurred pursuant to Bayne's 1986 accident. When Bayne thereafter questioned respondent about whether his medical bills had been paid, he discovered that they had not. Accordingly, Bayne brought an ethics complaint.

Following the filing of Bayne's complaint, the OAE conducted an audit of respondent's books and records that revealed that respondent had very few trust account matters and did not hold

large sums of money in his trust account. The audit further revealed that respondent did not maintain a trust account receipts journal, a trust account disbursements journal, or client ledger cards, and that he did not reconcile his trust account. The only records that respondent produced were his trust account checks and check stubs. He acknowledged that he kept track of his trust account only by maintaining a running balance on the check stubs. Respondent explained that he kept fees in his trust account, not as "overdraft protection," but to keep those funds from his wife, who assisted him with the office bookkeeping and had authority to sign his business account checks.

Respondent offered evidence to explain his failure to pay the medical bills. Respondent stated that when he sought to review the file after Bayne complained about Dr. Post's unpaid bill, he learned that his office staff had mistakenly "purged" it in 1988 or 1989. Respondent believed that approximately one hundred to one hundred and fifty files, including the *Bayne* file, were inadvertently destroyed by respondent's wife, who mistakenly assumed that the files had been examined and reviewed by respondent and left for destruction.

Respondent explained further that because he did not have the file, he requested that Bayne bring his records to respondent's office. When respondent reviewed the May 2, 1986 settlement statement, he could not recall whether he had paid the medical expenses. Respondent, however, never denied that the bills were not paid. He told Bayne that he did not have sufficient funds on hand to make immediate payment. Respondent suggested that he could arrange for the payment of the bills from the proceeds of a workers' compensation matter in which he was representing Bayne; respondent expected an imminent settlement in that case. Bayne agreed to await the payment of his medical bills until that case was settled.

The workers' compensation case was not quickly settled. Respondent wrote to several of Bayne's creditors and arranged to pay the medical bills in installments. The record discloses this

history of payments. On October 22, 1992, respondent paid Dr. Post $1200 toward the $2400 then due. Although respondent informed Dr. Post that he expected to pay the balance within three weeks, he did not pay the bill in full until March 16, 1994. It also appears that before the final payment to Dr. Post, an attorney filed a complaint against Bayne on behalf of Dr. Post for unpaid medical expenses of $1200. The attorney dismissed the complaint in September 1993, when he learned that in 1987, Dr. Robert Cohen, an associate of Dr. Post, had already obtained a judgment against respondent for the same bill. The attorney testified that, on April 3, 1987, he had agreed on behalf of Dr. Cohen to accept $2400 from respondent within ten days, in full settlement of the balance due of $2722.80, including fees and costs.

Respondent also paid Bayne's other remaining medical bills after the OAE audit was completed. On December 10, 1992, respondent guaranteed payment of $2434 to the Neurological Center. The record shows that respondent paid $300 on December 10, 1992, $1000 on July 30, 1993 and $600 as a final installment on March 11, 1994. On March 16, 1994 respondent paid the following remaining medical bills:

| | |
|---|---|
| Dr. Conrad Brahin | $54.00 |
| Dr. Martin Topiel | 125.00 |
| Zurbrugg Memorial Hospital | 5740.41 |
| Rancocas Orthopedic Associates | 100.00 |
| Dr. Szathmary | 360.00 |

Respondent testified that he borrowed money from his wife to pay Bayne's creditors.

By way of defense, respondent claims he simply forgot to pay Bayne's medical bills. He offered several reasons for his failure to act. Before respondent represented Bayne, in every other personal injury action he had handled, the client's personal injury protection (PIP) carrier had paid the medical bills directly. Hence, respondent explained, after he disbursed the settlement funds to Bayne, in his own mind his work on the case was over and he forgot to pay the remaining medical expenses.

Respondent also presented evidence that, when the *Bayne* matter settled in 1986, he suffered from diabetes, hypertension, depression, fatigue, forgetfulness, memory loss and an inability to concentrate for longer than an hour or two. Respondent related that following the death of his physician in 1984, he did not seek treatment from another doctor, allowing his diabetes to remain uncontrolled.

Mrs. Cavuto corroborated respondent's testimony about his health problems. She testified that, although respondent needed insulin as early as 1986, he refused to take it until 1990. Mrs. Cavuto stated that after 1986 respondent's health had deteriorated, he slept excessively, did not work as hard as in the past, was depressed and suffered some memory loss.

Two physicians testified on respondent's behalf. Peter A. Lodewick, M.D., a diabetes specialist, declared that he had examined respondent in 1990 and concluded that respondent's diabetes was not adequately controlled. Dr. Lodewick remarked that respondent was overweight and that, as a result of consuming excessive carbohydrates, he was sluggish, sleepy and irritable. According to Dr. Lodewick, high blood sugar, high blood cholesterol and high blood triglycerides result from overconsumption of carbohydrates, and can affect a patient's mood and thinking processes. Dr. Lodewick opined that inadequately controlled diabetes may cause depression, irritability, fatigue, sleepiness and forgetfulness.

Herbert E. Cohen, M.D., a specialist in cardiology and internal medicine, testified not as an expert, but as a fact witness. He related that he saw respondent in his medical office on nine instances from December 20, 1984 through December 18, 1987. Dr. Cohen observed that respondent had a poor memory, noting that his forgetfulness often resulted in missed appointments. He recalled that respondent telephoned his office to ask about blood test results and about prescribed medications shortly after the doctor's office had given him that information.

Respondent denied that he paid Bayne's medical bills in response to the OAE audit letter dated March 7, 1994. He pointed

out that the letter did not even mention Bayne. Respondent explained that he had paid the bills because Bayne recently had begun to telephone him at his office every day and at home at inconvenient times, such as 1:00 a.m. According to respondent, Bayne was taking anti-depressant medications and his behavior had become erratic. Mrs. Cavuto confirmed that Bayne frequently telephoned their home and that, during one conversation, he had been abusive toward her. As a result, respondent borrowed the necessary funds from his wife to pay Bayne's bills. About one month later, respondent arranged for another attorney to assume responsibility for Bayne's workers' compensation matter.

Charles Lawson, a certified public accountant, was called as an accounting expert on respondent's behalf. He testified that he had reviewed the reconstruction of respondent's trust account, which was prepared by the OAE based on respondent's trust account checkbook entries. According to Lawson, no conclusion could be drawn as to the accuracy of that reconstruction because there was no independent documentation or verification to support the checkbook entries. For example, there were no bank statements or canceled checks to compare to the entries in the checkbook to establish their accuracy.

## II

The DRB determined on a *de novo* review of the record that respondent's unethical conduct was clearly and convincingly supported by the evidence. More specifically, respondent's conduct constituted knowing misappropriation.

The DRB found that respondent knowingly misappropriated funds in 1986. The DRB recapitulated the facts surrounding the misappropriation:

On May 9, 1986 respondent deposited into his trust account settlement funds on behalf of his client, Bayne. After disbursing Bayne's share of the settlement and his own fee, respondent was obligated to pay Bayne's medical expenses. However, respondent failed to immediately pay the medical expenses or even to keep the funds intact in his trust account. Instead, respondent immediately began disbursing the funds to himself. Indeed, within two weeks of distributing the settlement

funds to his client, respondent invaded the funds that were escrowed for payment of the medical expenses and within three months all of the money had been spent.

The DRB noted that the DEC did not find clear and convincing evidence of a knowing misappropriation in 1986; the DEC was not convinced that the OAE had rebutted respondent's testimony that he could not recall why, in 1986, he had not paid the bills and that the failure to pay those bills was an oversight resulting from the passage of time, sloppy bookkeeping, and poor health.

The DRB did not credit respondent's explanation that "he simply forgot to pay the creditors." It stressed that respondent disbursed the funds to himself over a very short period of time; he issued twenty-two checks totaling $26,259 within a three-month period. The DRB concluded that "[r]espondent knew that, once the trust account balance fell below $12,727.86, he would be invading client funds," and that "because respondent had very few trust account matters and maintained a running balance in his checkbook, he had to be aware that he was spending his client's funds."

We note that four members of the DRB dissented from the recommendation that respondent be disbarred for knowing misappropriation. The dissent concluded that because Bayne had agreed that respondent could pay the medical bills upon the resolution of the workers' compensation matter, there could not have been a knowing misappropriation of client funds.

### III

We determine based on clear and convincing evidence that respondent engaged in the knowing misappropriation of client funds. Respondent either knew or had reason to know that he was invading client funds when he immediately started to issue checks to himself and failed to retain the required amount to pay his client's medical bills. The inference of knowledge is clear and inescapable. Further, in these circumstances, that inference is not dispelled by the utterly speculative and conjectural theory that during the time respondent was regularly withdrawing moneys

from his trust account for his own purposes, he was simultaneously depositing trust moneys from other sources that offset those withdrawals.

We are satisfied that the arrangement for the payment of the medical bills between Bayne and respondent long after the diversion had already occurred does not tend to establish that there had been no knowing misappropriation of client's funds or that such a diversion had implicitly been authorized or later waived by Bayne.

We are also unpersuaded that respondent had a lapse of memory when he withdrew the trust moneys, particularly because the withdrawals began within days after entering a settlement that expressly and specifically provided that respondent must pay outstanding medical bills and listed the providers whose bills were to be paid. It is not reasonable to conclude that respondent contemporaneously forgot that the money was to be used to pay medical bills on behalf of his client or forgot about the existence of those bills, as he regularly and in quick succession—almost on a daily basis—drew checks on the that fund over a period of two months. Respondent's excuse that he was confused because in other cases such payments were covered by PIP insurance and paid by insurers is totally implausible in view of the fact that his disbursements to himself from those trust moneys occurred immediately following the settlement of the *Bayne* case and contrary to his express agreement to pay Bayne's medical bills himself.

■ We are also unconvinced that respondent's health condition—specifically, his forgetfulness—serves to negate or neutralize his knowing misappropriation. Respondent's conduct in actively and regularly drawing numerous checks from his trust account in discrete and specific amounts for various purposes and uses of his own, bespeaks a level of competence and awareness concerning his personal or business affairs that is totally inconsistent with his assertion that he did not recall, or could not at the time of those withdrawals have remembered that there remained unpaid medical bills. The evidence falls short of the loss of competence

sufficient to overcome knowing misappropriation. *See In re Greenberg*, 155 *N.J.* 138, 714 *A.*2d 243 (1998); *In re Jacob*, 95 *N.J.* 132, 469 *A.*2d 498 (1984).

## IV

Respondent is subject to disbarment. *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979). The DRB correctly and fairly related the authority that supports this discipline. It pointed out that *In re Noonan*, 102 *N.J.* 157, 506 *A.*2d 722 (1986), defines the requirements for a finding of knowing misappropriation:

> The misappropriation that will trigger automatic disbarment under *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979), disbarment that is "almost invariable," *id.* at 453, 409 *A.*2d 1153, consists simply of a lawyer taking a client's money entrusted to him, knowing that it is the client's money and knowing that the client has not authorized the taking. It makes no difference whether the money was used for a good purpose or a bad purpose, for the benefit of the lawyer or for the benefit of others, or whether the lawyer intended to return the money when he took it, or whether in fact he ultimately did reimburse the client; nor does it matter that the pressures on the lawyer to take the money were great or minimal. The essence of *Wilson* is that the relative moral quality of the act, measured by these many circumstances that may surround both it and the attorney's state of mind, is irrelevant: it is the mere act of taking your client's money knowing that you have no authority to do so that requires disbarment.... The presence of "good character and fitness," the absence of "dishonesty, venality, or immorality"—all are irrelevant. While this Court indicated that disbarment for knowing misappropriation shall be "almost invariable," the fact is that since *Wilson*, it has been invariable. [Footnote omitted]
>
> [*Id.* at 159–160, 506 *A.*2d 722.]

Thus, under *Noonan*, as the DRB further explained, dishonesty or an intent to steal or defraud, or dishonesty, is not required. The relevant facts are that the lawyer knows that the funds are not his or hers, and knows that the client has not consented to the taking. The absence of evil motives, the lack of intent to permanently keep the moneys, the good use to which the funds may be put, or the lawyer's prior unblemished character will not excuse misappropriation that was knowing and volitional. *Ibid. See also In re Pomerantz*, 155 *N.J.* 122, 714 *A.*2d 233 (1998); *In re Greenberg*, *supra*, 155 *N.J.* 138, 714 *A.*2d 243. The DRB reiterated this

Court's observation in *In re Roth,* 140 *N.J.* 430, 445, 658 *A.*2d 1264 (1995):

> The line between knowing misappropriation and negligent misappropriation is a thin one. "Proving a state of mind—here, knowledge—poses difficulties in the absence of an outright admission." *In re Johnson,* 105 *N.J.* 249, 258, 520 *A.*2d 3 (1987). However, this Court has noted that "an inculpatory statement is not an indispensable ingredient of proof of knowledge, and that circumstantial evidence can add up to the conclusion that a lawyer 'knew' or 'had to know' that clients' funds were being invaded." *Ibid.* In this case, that circumstantial evidence includes repeated invasions of client funds that were required to be held inviolate. The testimony adduced convincingly suggests that respondent "knew," or "had to know" that he was invading client funds.

We determine that respondent is guilty of knowing misappropriation of client's funds in violation of the *Rules of Professional Conduct.* We determine further that respondent is subject to public discipline and should be disbarred. Respondent shall reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

O'HERN, J., dissenting.

Thirteen years after the fact, the Court disbars an attorney essentially because he cannot reconstruct his trust accounts for the year 1986. That result is unfair, unjust, and conflicts with our precedent.

The Decision Memorandum of the District III B Ethics Committee (DEC) best summarizes the facts and the law.

> The OAE has produced clear evidence that the portion of the Bayne settlement funds which were deposited in Respondent's trust account and retained by Respondent for disbursement to medical providers was neither disbursed to those providers nor retained in Respondent's trust account. The trust account balance was $1,130.71 on July 31, 1986, when it should have been at least $12,727.86 to cover the medical providers' bills. At that same time, as best the records can be reconstructed, checks were being written by Respondent to Respondent as well as others (who were not the medical providers). Respondent has testified that he has no recollection of why he wrote checks to himself and did not pay the medical providers. He excuses this oversight by reference to the passage of time, sloppy bookkeeping and ill health.
>
> At least in part due to the passage of time, the OAE has no contrary evidence to present regarding Respondent's state of mind in 1986. It is clear that a misappropriation occurred in 1986. What is not clear is whether this was a knowing or a

negligent misappropriation. Evidence of Respondent's state of mind, that he knew that he misappropriated his client's funds rather than negligently invaded the trust, must be clear and convincing. *In re Konopka*, 126 *N.J.* 225, 233, 596 *A.2d* 733 (1991). Therefore, this Panel is not able to conclude that there was a knowing misappropriation of client funds in 1986.

The Report and Recommendation of the DRB, a 5–4 decision in which both the Chair and Vice Chair voted against disbarment, is disturbing and has a detached feeling to it. The DRB refers to itself in the third person, not in the first. Rather than to say, "we find by clear and convincing evidence that respondent knowingly misappropriated client funds," the DRB's Report states, as though the DRB were referring to some other body, that "the Board determined that, because respondent had very few trust account matters and maintained a running balance in his checkbook, he had to be aware that he was spending his client's funds."

Also, the main premise of the DRB Report seems flawed to me. The Report recites that ". . . within two weeks of distributing the settlement funds to his client, respondent invaded the [escrow] funds . . . ." To begin with, it is simply not true that respondent had "very few trust account matters." In addition, the DRB infers that the running balance on Cavuto's check stubs demonstrates that he knew that he was invading client funds. The problem with that analysis is that we have a series of checks but not a series of bank statements. The record simply does not disclose whether client funds were actually invaded. There may have been deposits in the trust account sufficient to cover the withdrawals.

Who should bear the burden of the absence of bank records dating back that far? The OAE says that respondent should be presumed to have had knowledge that he was invading client funds. Presumptions of criminal intent have long been disfavored in the law. *Sandstrom v. Montana*, 442 *U.S.* 510, 99 *S.Ct.* 2450, 61 *L.Ed.*2d 39 (1979). It is to be remembered that in *In re Fleischer*, 102 *N.J.* 440, 449–50, 508 *A.2d* 1115 (1986), it was not bad bookkeeping that caused the attorneys in the firm to be disbarred, but the fact that they admitted that they had pooled their trust

and business accounts in order to meet their operating expenses. They knew that they were invading client funds. I realize that much is expected of lawyers, but a lawyer should not have to prove his innocence thirteen years after the fact. Absent clear and convincing evidence of a knowing misappropriation, a suspension is sufficient discipline.

I therefore dissent.

*For disbarment*—Chief Justice PORITZ and Justices HANDLER, POLLOCK, GARIBALDI, STEIN and COLEMAN—6.

*For suspension*—Justice O'HERN—1.

## O R D E R

It is ORDERED that ANTHONY J. CAVUTO of MOUNT HOLLY, who was admitted to the bar of this State in 1966, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that ANTHONY J. CAVUTO be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that all funds, if any, currently existing in any New Jersey financial institution maintained by ANTHONY J. CAVUTO, pursuant to *Rule* 1:21-6, be restrained from disbursement except upon application to this Court, for good cause shown, and shall be transferred by the financial institution to the Clerk of the Superior Court who is directed to deposit the funds in the Superior Court Trust Fund, pending further Order of this Court; and it is further

ORDERED that ANTHONY J. CAVUTO comply with *Rule* 1:20-20 dealing with disbarred attorneys; and it is further

ORDERED that ANTHONY J. CAVUTO reimburse the Disciplinary Oversight Committee for appropriate administrative costs.