661 A.2d 275

IN THE MATTER OF RAMON A. IRIZARRY, AN ATTORNEY AT LAW.

Argued February 28, 1995—Decided July 21, 1995.

John J. Janasie, Deputy Ethics Counsel, argued the cause on behalf of Office of Attorney Ethics.

Theodore W. Daunno and Ramon A. Irizarry, pro se, argued the cause for respondent (Mr. Daunno, attorney).

PER CURIAM.

The District XIV Ethics Committee (DEC) charged respondent with knowing misappropriation of client funds, RPC 1.15 and 8.4(c); gross neglect, RPC 1.1(a); and lack of diligence, RPC 1.3. The Special Master recommended public discipline, and the Disciplinary Review Board (DRB) recommended disbarment. We agree that the record clearly and convincingly establishes that respondent knowingly misappropriated client funds. Accordingly,

we adopt the recommendation of the DRB and order that respondent be disbarred.

-I-

Respondent first came to the attention of the Office of Attorney Ethics (OAE) when respondent's check to the Clients' Security Fund, now known as the Lawyers' Fund for Client Protection, was returned for insufficient funds. The OAE naturally scheduled a select audit of respondent's books. A field auditor with the OAE conducted the initial audit on January 27, 1989. The OAE conducted subsequent audits ending in May 1990. On July 17, 1990, we temporarily suspended respondent. With his consent, respondent has remained under suspension to date.

Respondent admits that when the auditor arrived for the initial audit, respondent's office was in chaos. The auditor found severe deficiencies and irregularities in respondent's records. More significantly, after constructing a tentative balance of respondent's books, the auditor discovered a shortage of $37,465.31 in respondent's trust account. He directed respondent to close the existing trust account and open a new one. Although respondent disputes that the auditor directed him to close the account, both the Special Master and DRB rejected respondent's testimony and accepted that of the auditor. Moreover, respondent does not dispute that he knew that the deficit existed.

Nor could he. Respondent had received numerous bank statements revealing that his trust account was overdrawn. At the time of the select audit, the ledger cards for several clients showed debit balances totaling $12,982.94.

In addition, respondent deposited personal funds into the trust account on several occasions. To respondent's credit, the deposits reflect an attempt to bring the account into balance. The deposits also evince, however, respondent's knowledge of the trust account deficit.

Contrary to the OAE's instructions, respondent continued to use the old trust account not only to draw checks to other drawees, but also to pay himself fees, thereby exacerbating the deficiency. From February 3 through July 28, 1989, respondent drew trust account checks to himself totaling more than $32,000.

Although the record reveals constant deficiencies in respondent's trust account, one matter, respondent's representation of Zoilo and Maria Maldonado, suffices to establish that respondent is guilty of knowing misappropriation. Respondent represented the Maldonados in connection with their purchase of certain real estate from Ramon and Tirsa Martin. Respondent received $55,420.10 from his clients and deposited this sum into his old trust account. The closing, held on April 14, 1989, proceeded routinely.

Respondent issued a $45,987.51 trust account check, dated April 27, 1989, and made payable to Citicorp Mortgage, to pay off the first mortgage. The record does not reveal the date on which respondent forwarded the check to Citicorp. The check was presented for payment, however, on July 12. It was returned unpaid because of insufficient funds. When presented on July 19, 1989, the check was again returned for insufficient funds.

Although respondent subsequently deposited personal funds into the account, he never deposited enough to pay principal, interest, and penalty charges due Citicorp. Ultimately, the title company satisfied the mortgage. By issuing trust account checks to himself, respondent knowingly invaded the Maldonado's trust funds. He is guilty of knowing misappropriation.

-II-

"We have consistently maintained that a lawyer's subjective intent, whether it be to 'borrow' or to steal, is irrelevant to the determination of the appropriate discipline in a misappropriation case." *In re Warhaftig*, 106 *N.J.* 529, 533, 524 *A.*2d 398 (1987); *In re Noonan*, 102 *N.J.* 157, 160, 506 *A.*2d 722 (1986). Misappropria-

tion "includ[es] not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom." *In re Wilson*, 81 *N.J.* 451, 455 n. 1, 409 *A.*2d 1153 (1979). The record clearly and convincingly establishes that respondent issued trust account checks to himself knowing that he was out of trust and that he was invading trust funds.

Respondent seeks to exculpate himself by stating that he relied on his bookkeeper and office staff. He asserts that he habitually signed trust account checks in blank and left them with office personnel to complete. He attributes the misuse trust funds in the Maldonado matter, and indeed all of his troubles, to high employee turnover, his medical problems, and extensive travel to his law office in Puerto Rico.

An attorney's duty to preserve clients' funds, however, is nondelegable. Lawyers may not absolve themselves of the misappropriation of client funds by delegating to employees the authority to complete signed checks and then failing to supervise those employees. "The intentional and purposeful avoidance of knowing what is going on in one's trust account will not be deemed a shield against proof of what would otherwise be a 'knowing misappropriation.'" *In re Johnson*, 105 *N.J.* 249, 260, 520 *A.*2d 3 (1987); *see also In re Davis*, 127 *N.J.* 118, 130, 603 *A.*2d 12 (1992) (misappropriations occurring after respondent had been placed on notice about egregious bookkeeping practices constituted knowing misappropriation or were product of "willful" ignorance).

*In re Skevin*, 104 *N.J.* 476, 517 *A.*2d 852 (1986), *cert. denied*, 481 *U.S.* 1028, 107 *S.Ct.* 1954, 95 *L.Ed.*2d 526 (1987), is particularly instructive on this issue. Like respondent, Skevin denied that he had knowingly misused funds. Skevin asserted that he had deposited in his trust account almost $1,000,000 in personal funds, a sum that he thought was sufficient to cover personal withdrawals. *Id.* at 483, 517 *A.*2d 852. He did not maintain a running balance of his own funds in the account. He simply assumed sufficient funds existed for the disbursements. *Id.* at 485, 517

*A*.2d 852. We reasoned that "each such [disbursement] posed an at least realistic likelihood of invading the accounts of another client since respondent had no way of knowing what the balances were." *Ibid.* We held that "willful blindness satisfies [the] requirement of knowledge...." *Id.* at 486, 517 *A*.2d 852 (citation omitted). In so holding, we stated that a knowing misappropriation may be established by "evidence [that] clearly and convincingly demonstrates that [respondent] knew the invasion was a likely result of his conduct...." *Ibid.*

■ A willfully blind respondent who "is aware of the highly probable existence of a material fact but does not satisfy himself that it does not in fact exist," *ibid.*, is as culpable as the respondent who knowingly misappropriates. At a minimum, respondent was willfully blind. As we stated in *Wilson, supra,* "disbarment is the only appropriate discipline [for knowing misappropriation of client funds]." 81 *N.J.* at 453, 409 *A*.2d 1153.

Throughout these proceedings court-appointed *pro bono* counsel has represented respondent. Respondent's counsel cross-examined the OAE's auditor and argued before both the DRB and this Court.

Respondent has moved to remand the case for further proceedings before the Special Master. We find no basis for a remand. The Special Master, the DRB, and this Court have already considered the dispositive issues.

We hereby order that respondent be disbarred. He shall reimburse the Ethics Financial Committee for appropriate administrative costs, including the costs of transcripts.

O'HERN, J., dissenting.

The Court accepts the analysis of the Disciplinary Review Board (DRB) that premises respondent's disbarment on three predicates: (1) his payment of fees to himself out of a trust account that he had been advised to close, (2) his misuse of mortgage closing proceeds in connection with the Maldonado/Mar-

tin closing, and (3) his willful ignorance of record-keeping requirements tantamount to a knowing misuse of client funds. Because the record does not establish by the requisite standard of clear and convincing evidence that such conduct established a knowing misappropriation of client funds, *In re Wilson*, 81 *N.J.* 451, 409 *A.*2d 1153 (1979), I must dissent.

On January 27, 1989, Chris McKay, a field auditor for the Office of Attorney Ethics (OAE), appeared at respondent's office. Respondent maintained a busy practice in cramped quarters above a luncheonette in Newark. His office was roughly fifteen feet by twenty feet. Behind it was a smaller room where his financial records were laid out on a table. When McKay arrived, respondent's wife was posting entries into the ledger cards. McKay received "a stack of client ledger cards. There were two boxes full of bank statements for the trust and the business account and they were loosely folded over, one-write journal sheets, which is basically the checkbook register for a one-write system. It's a carbon system." Respondent had previously engaged Matthew Azares, a certified public accountant, and was in the process of converting his books from a manual system to a computerized system. He planned to put the data into the "Libra" system, a computerized system of bookkeeping designed in consultation with the OAE. The work was incomplete. McKay said: "To be honest with you, there were people coming in and out throughout the whole first day of the audit there. There did seem to be some confusion. There's no doubt about that."

McKay constructed a tentative balance of respondent's books. He did that by examining the client ledger cards and comparing them with the bank balances and the check register. By the afternoon of January 27, 1989, McKay had established that balance. He concluded that respondent's books were "short over $37,000." Ironically, $30,000.00 of the deficit was accounted for by a ledger card indicating that it represented respondent's own funds. The explanation for that card is somewhat unclear and unsatisfactory, but as near as can be determined, respondent

maintained that amount in his account as a "float" to guard against any possible shortages.

The problem with accepting the OAE's analysis of a deficit is that it assumes the existence of a good bookkeeping system: that when trust account checks were issued, corresponding debits would have been made on the ledger cards. Respondent had been using a "one-write system." Under that system of carbons, a ledger card is to be inserted manually under the checkbook and entries are to be made automatically in a running ledger, on the client ledger card, and on the check. There is no evidence, however, that that occurred here. In fact, at the time of the audit in January 1989, respondent's account had not been reconciled since December 1987.

McKay described the scene of the audit:

> I was provided with some legal pad, much like it was prepared and written and torn off that were in several statements, but I don't know for certain that the numbers that were written on those pieces of legal paper were prepared just for the day I was there or prepared prior to it. In other words, even if—I recall three or four different months having that yellow paper, but I don't know if that was again began before the [accountant's] engagement letters * * *.

He explained that he "was trying to get bits and pieces of information from all the individuals," and he asked them for various documents. Based on his analysis, McKay concluded that "[t]here [were] more [funds] on client cards than the bank balance showed as of November."

A critical exchange between McKay and respondent followed. McKay testified that he had instructed respondent to close his old trust account and to open immediately a new Libra trust account. Respondent characterized the conversation differently. He thought that initially he had to get his books in order so that the question of deficits could be straightened out. As noted, one of the negative balances in the trust account represented $30,000.00 of respondent's money. Therefore, respondent believed, on the basis of McKay's tentative analysis, that the maximum shortfall in the account was $7,000.00. Following McKay's departure from respondent's office, follow-up correspondence was sent to respon-

dent by the head auditor of the OAE, Samuel Gerard. That letter contained no reference to the closing of the trust account but made formal demands on respondent. Respondent was to provide records requested previously, and "bank statements and cancelled checks for the attorney business account for the two years preceding January 31, 1989 * * *."

A period of protracted exchanges followed. Occasionally, Azares submitted data to McKay but it never fully satisfied the OAE. Therefore, the OAE moved for the immediate temporary suspension of respondent for failure to reconcile his trust accounts properly. Further, the OAE feared that respondent's continued activity would endanger clients' trust funds. We entered an order of temporary suspension on July 20, 1990. Subsequently, the OAE filed a formal complaint against respondent. The matter was referred to a Special Master for the district-level hearing. There are three crucial allegations in the complaint that are the predicates for the conclusion of the Special Master and the DRB that respondent is guilty of knowing misappropriation. The OAE summarized the charges in the brief it submitted to this Court:

> The Board, as well as the Special Master, has found the respondent guilty of knowing misappropriation of client trust funds because of [1] his regular payment of "fees" to himself out of a trust account that he knew was already short, as well as [2] his knowing misappropriation of the Maldonado [closing] funds. : * * * Furthermore, during the time period in question, respondent deposited almost $88,000 into the trust account trying unsuccessfully to cover shortages. * * *
>
> Additionally, the Board unanimously recommends the respondent's disbarment for [3] his "willful ignorance" of his record keeping practices, and reckless approach to the sanctity of his client trust funds citing *In re Skevin*, 104 *N.J.* 476 [517 *A*.2d 852] (1986) and *In re Davis*, 127 *N.J.* 118 [603 *A*.2d 12] (1992). Even when advised by McKay of the serious trust account shortages, respondent did not even bother to look at his bank statements to see what he had on deposit, but continued to misappropriate.

The first two charges are detailed in paragraphs eleven and twelve of the formal ethics complaint. Paragraph eleven alleges that "[d]uring the period of February through August 1989, despite respondent's receipt of overdraft notices and McKay's advice alerting respondent to the shortage in his attorney trust account, respondent knowingly aggravated the shortage by issuing

himself * * * twenty-seven checks, totaling in excess of $34,000."
Paragraph twelve of the complaint alleges that

> on April 17, 1989, while representing Zoilo and Maria Maldonado, [respondent]
> deposited into his shorted attorney trust account $69,095.60 during a real estate
> transaction. These funds were earmarked, in part, to satisfy an existing mortgage
> in the name of Ramon and Tirsa Martin, herein "Martin mortgage", on the
> property purchased by the Maldonados.

That mortgage, held by Citicorp Mortgage, Inc. (Citicorp), had a
balance at closing of $45,987.51. On April 27, 1989, respondent
issued an attorney trust account check in the amount of $45,987.51
to Citicorp to satisfy the mortgage. That check, however, was
returned for insufficient funds on July 12, 1989. The check was
presented for payment again on July 19, 1989, but again it was
returned.

With respect to the withdrawal of approximately $34,000.00 in
attorney's fees from the trust account, respondent explained that
that sum represented either retainers that he had received to
perform legal services, or fees that he had earned in connection
with other client matters. In no case have we ever disbarred an
attorney who withdrew fees from properly deposited settlement
checks. However, in *In re Skevin*, 104 *N.J.* 476, 485, 517 *A.*2d 852
(1986), an attorney was disbarred due to his *advance* withdrawal
of fees. Here, McKay acknowledged that there was "nothing
wrong" with Irizarry's withdrawal of properly documented fees or
retainers. McKay said, in response to questioning that attorneys
often deposited retainers in their trust accounts:

> Q. [SPECIAL MASTER]: Assuming that you want to advance costs against any
> type of transaction, why would you put the money in your trust account?
>
> A. MCKAY: It was at some point it was very common to utilize the trust account
> to advance costs. Before a lot of the restrictions came in.
>
> Q. [SPECIAL MASTER]: And that was many attorneys would do that?
>
> A. MCKAY: Especially senior practitioners. They lean towards it more heavily.

Respondent testified that he believed that he could not satisfy the
retainer without drawing on the funds. Respondent's counsel
questioned McKay:

> Q. [W]hat was wrong with the $34,000.00 that Mr. Irizarry took out of [the trust]
> account?

A. Aside from realizing that the trust account was in *maybe* in a negative way, setting that aside, *nothing.*

Q. And we didn't even know it was in a negative way?

A. No. That's why I said it's only according to his records, that nothing should be done until his people—until Matt Azares [the CPA] could determine whether or not there were balances or don't take funds out unless it's going to a client and you are certain and then the funds can be from one trust account to another.

Q. In fact, you used that language a little earlier. You said don't take anything out of there unless you are absolutely certain on that individual. Is that correct?

A. That's correct.

Q. So again, as you just said, there's nothing wrong [with] what he did, except for the fact you said there's a *possibility* of him being short or not short?

A. That's correct.

[Emphasis added.]

Because McKay's information was derived largely from data furnished by respondent, whether those were earned fees does not appear to have been definitively resolved. When answering a question about whether respondent was entitled to those fees, McKay explained:

That was hard to determine, because if you review the checks, only a couple of them have notations for the cases that they were on behalf of. The rest were issued without any notation. And again this goes over to where Matt Azares did some work and he was instructed to apply those fees to specific cases. So at the time of the review when I picked up those checks, I could not be told accurately which matter they were on behalf of. That was determined at a later point.

The documentation Azares submitted to the OAE suggests that the amounts withdrawn represented fees or costs to which respondent was entitled. The complaint, however, lists the checks totaling $34,242.00, which "aggravated the shortage" in the trust account. The reconciled accounts submitted by Azares show some of his explanations:

| Check # | Date | Amount | Azares Explanation |
|---|---|---|---|
| 1152 | 2/9/89 | $1,000.00 | Earned fee on Juan Torres matters. More than $118,000.00 transaction; total fees $3700.00. |
| 1160 | 2/16/89 | $1,200.00 | Earned fee on Rafael Tavarez matters. Total transaction approximately $37,000.00; total fees $3050.00. |
| 1265 | 6/15/89 | $1,200.00 | Earned fee on Eddy Davis matters. A $55,000.00 transaction; total fees approximately $3000.00. |

| Check # | Date | Amount | Azares Explanation |
|---------|------|--------|--------------------|
| 1272 | 7/7/89 | $ 300.00 | Reimbursement for costs of $300.00 attributable to $12,300.00 negligence case of Michael Rodriguez; fees $4088.66. |

While not among the items complained of, Angel Cruz' account shows a personal injury award of $15,000.00 in May 1988, and a fee of $2433.00, representing the balance of the total fee of $4933.00. That money was collected in May 1989. Some of those entries may have the flavor of after-the-fact reconciliations, but on their face the accounts appear plausible.

With respect to the Martin/Maldonado mortgage, the record does not establish why the check issued on April 27, 1989, was not presented for payment until July 12, 1989. At that time there were insufficient funds in respondent's trust account to cover that check. The check was presented again for payment on July 19, 1989, but again the account was overdrawn. On August 31, 1989, respondent transferred his remaining attorney trust account balance of approximately $17,000.00 into a new attorney trust account that he had opened on May 8, 1989. That amount was reserved for the Martin mortgage. Aware that the funds in that account were insufficient to satisfy the Martin mortgage, respondent borrowed funds and increased the balance to over $46,000.00. On October 19, 1989, he issued his attorney trust account check in the amount of $46,037.51 to Citicorp to satisfy the Martin mortgage. Citicorp refused to accept the check because interest had accrued.

A distressing series of missed communications ensued. The bank insisted that respondent should deal only with its attorneys. When respondent contacted the bank attorneys, he was referred to a paralegal. The paralegal was too busy to return his call. Things went from bad to worse. Believing that it was no longer needed, respondent's staff returned the money that he had borrowed. The mortgage went into default and ultimately the title insurance company satisfied the mortgage. Respondent acknowl-

edged that he owed more than $52,000.00 to the title insurance company for his neglect.

To explain those shortfalls, respondent points to a number of deficiencies in his office procedures. Most notably, he explained that he had found a duplicate payment of $25,000.00 made in connection with another house closing. Following McKay's appearance, his office was in turmoil. His bookkeeper, Kelly Ann Irizarry, became very ill and missed many days of work. His computer expert, who was also the office manager, had an ulcer that became aggravated. Despite those explanations, the DRB, citing *In re Skevin, supra*, 104 *N.J.* 476, 517 *A.*2d 852, and *In re Davis*, 127 *N.J.* 118, 603 *A.*2d 12 (1992), recommended that respondent be disbarred for "willful ignorance" of his record-keeping practices and a reckless approach to the sanctity of his client trust fund.

This case, however, falls far short of the clarity of *Skevin* or *Davis*. In *Skevin*, the attorney intentionally withdrew money from existing trust funds anticipating a later receipt of funds from settlements made but not yet collected. 104 *N.J.* at 477–81, 517 *A.*2d 852. In *Davis*, there was clear and convincing evidence that the respondent engaged in knowing misappropriation of client trust funds. 127 *N.J.* at 120, 603 *A.*2d 12. Nor is this case similar to *In re Warhaftig*, 106 *N.J.* 529, 524 *A.*2d 398 (1987), in which the attorney systemically borrowed funds for his own personal use from client trust accounts. Although a lawyer may not deliberately establish a set of books so confused that client trust funds are endangered, *In re Johnson*, 105 *N.J.* 249, 260, 520 *A.*2d 3 (1987); *In re Orlando*, 104 *N.J.* 344, 350, 517 *A.*2d 139 (1986), respondent does not appear to have undertaken such activity. He is not like the attorneys in *In re Fleischer*, 102 *N.J.* 440, 508 *A.*2d 1115 (1986), who deliberately established a system whereby they could pay office expenses out of their trust accounts.

Respondent appears to be more like the attorney in *Johnson, supra*. In that case an attorney allegedly failed to carry out contracts of employment, kept retainers without performing ser-

vices therefor, commingled clients' trust funds, failed to account to his clients, and demonstrated a pattern of neglect in handling clients' legal matters. The OAE sought the disbarment of that attorney, and the DRB recommended a three-year suspension. We accepted the DRB's recommendation. 105 *N.J.* at 251, 520 *A.*2d 3. We said:

> The OAE contends that respondent "had to know" that [he knowingly misappropriated clients' funds]. * * * But respondent's calamitous method of doing business is just as reasonable an explanation of the situation (to the extent that any explanation is "reasonable" in these proceedings) as the one the OAE would have us accept, based as it is on the assumption that respondent had any knowledge of what was going on with his accounts. The evidence about respondent's state of mind is no more compelling in the direction of knowledge than it is in the direction of unhealthy ignorance; and before we will disbar on the basis of a lawyer's knowing misappropriation, the evidence of that knowledge must be clear and convincing.

> \*        \*        \*        \*        \*        \*        \*        \*

> We perceive that respondent was either a most evil man—a thief—or he was spectacularly misguided in his all-consuming effort to build a practice at the expense of other considerations—most of them ethical and professional considerations, some of them personal. We reject the first proposition and accept the second. Respondent's intense dedication became his undoing. His tireless industry in the interest of some clients made him a danger to others. The shambles he created in his office has brought him perilously close to the permanent loss of the right to practice, which he worked so hard to earn.

> [*Id.* at 258–59, 520 *A.*2d 3.]

In *In re Gallo,* 117 *N.J.* 365, 372, 568 *A.*2d 522 (1989), we explained that "to find that [an attorney] knowingly misappropriated * * * clients' funds, we must find clear and convincing evidence of such a misappropriation." In that case, review of the trust account balances disclosed that those funds were invaded and commingled. *Id.* at 369–71, 568 *A.*2d 522. We and the DRB concluded, however, that although the respondent had been grossly negligent in his approach to record keeping, he had not knowingly misappropriated client funds. We said: "Whether through ignorance or inattentiveness, the accounting procedures in respondent's office at the time of his audit were entirely inadequate." *Id.* at 373, 568 *A.*2d 522. The principal distinction between *Gallo* and this case, however, is that in *Gallo* "no client ever suffered

financial injury as a result of respondent's ethical violations." *Id.* at 374, 568 *A.*2d 522.

Although no client has suffered financial injury as a result of respondent's ethical violations, the claim of Commonwealth Title Insurance Company remains unsatisfied. The DRB found that "between 1988 and 1989, respondent deposited over $92,000 of his own funds into the trust account to cover cost advancements and errors." Thus, it seems illogical that he would not have made up the final deficiency in the Martin mortgage. Respondent contended that the shortfall in funds was caused by an erroneous assumption by his staff that certain funds were available for disbursements. That assumption stemmed from the failure of respondent's staff to deduct approximately $25,000.00 from a client's ledger card while simultaneously transferring that sum to another ledger card of that client.

What we are left with in this case is proof of an office in "shambles," *Johnson, supra,* 105 *N.J.* at 259, 520 *A.*2d 3, but no smoking gun. We are also left with the unsatisfactory prospect of disbarring an attorney because his records are incomplete and inadequate. Respondent spent $650.00 per week in an effort to reconcile his accounts. In the proceedings below, great emphasis was placed on the fact that McKay had told respondent to discontinue use of his old trust account. Because that message was conveyed in a confused setting (people were standing in the office doorway during the discussions, and some follow-up discussions took place in the luncheonette below the office) and because Gerard's follow-up letter did not refer to such a request, I think it would be terribly unfair to disbar on that basis.

In his opening remarks to the Special Master, counsel for the OAE said: "We feel [this is] a case of knowing misappropriation * * *." More than that is required. Although the record clearly shows blatant record-keeping violations under *RPC* 1.15(d), a finding of knowing misappropriation cannot be sustained by clear and convincing evidence. As we have done in other cases, I conclude that "respondent's problems stemmed from flagrant rec-

ord-keeping errors combined with an apparent lack of comprehension of the proper operation of an attorney's bank accounts. He apparently failed to recognize or understand that 'part of [his] responsibility to the legal system is the maintenance and supervision of accounting records.'" *In re Grabler,* 114 *N.J.* 1, 12, 552 *A.*2d 596 (1989) (quoting *In re Orlando, supra,* 104 *N.J.* at 350, 517 *A.*2d 139). Respondent's situation is unlike the attorney in *In re Brown,* 102 *N.J.* 512, 509 *A.*2d 176 (1986). In that case, the attorney knowingly invaded the trust funds of one client to pay another after a client had given the attorney a bad check that caused the initial shortage of funds. *Id.* at 514, 509 *A.*2d 176. That attorney was disbarred.

In this case, respondent was actually unaware, in some instances, that certain clients had received more funds than they were entitled to. In addition, the OAE's auditor, McKay, admitted that his own assumptions were based on the accuracy of respondent's books. Eventually, respondent replaced Azares with another accountant, Arceldine Decine. She reviewed the old trust account and the new trust account. In her report she noted:

No bank reconciliations had been performed in the account since December 1987. * * * Debits and credits were overlooked and not posted to the client ledger until a subsequent month resulting in the writing of checks against unavailable funds. Checks deposited by a client which subsequently bounced were not debited to the client ledger on a timely basis resulting in the writing of checks for that client against unavailable funds. Multiple ledgers were opened for the same client resulting in confusion, mispostings and a lack of balance accountability. * * * The most notable of these errors was * * * an unsubstantiated credit of $30,000 * * *.

In his report of July 10, 1990, Azares recapitulated his experience in these matters. He said that in the heat of the rush to meet the OAE audit, "[b]ank statements and cancelled checks ended up in bundles with no logical order. Cash disbursements and cash receipts became unidentifiable as to dates, clients and nature. Reconciliation of the trust account became virtually impossible in such a short time." Azares never completed his work but he said: "Without the work completely finished, it seems that any deficit in the trust ledger account would be the result of staff chaos and staff errors. There are also symptoms that inadvertent

overpayments to or on behalf of certain clients were also the major reasons for such deficit."

Obviously, all of this falls far short of the certainty that is required in such matters. It is not realistically possible for the OAE to reconstruct the records of an attorney whose records were in such a state. File numbers did not exist for many matters, and numerous files were kept in piles or cartons. Still, we cannot and should not disbar attorneys because of frustration over their ineptness. We may end up disbarring attorneys (mostly sole practitioners whose clients have a great need for their services) not because the attorneys lack skill as advocates, but because they lack skill as office managers.

I believe that the five-year suspension of respondent, during which his case was sorted out, has vindicated the public interest and impressed upon respondent an understanding of his full responsibility for supervision of the accounting practices in his firm. As a condition of restoration of practice, I would order that respondent practice under the supervision of another attorney or provide the OAE with a certified audit of the books and records required to be maintained pursuant to *Rule* 1:21-6 on a quarterly basis. I would also order that if he practices alone, his attorney trust account should be maintained under co-signatory power with a certified public accountant of the State of New Jersey. Such arrangement, I believe, should continue until such time as the Court is assured that respondent's systems for office management are operating properly.

Friends and associates of Ramon Irizarry attest to the significant contributions that he has made to his community. They have emphasized that respondent, through his law practice, has been devoted to helping minority businesses grow and develop as equal partners in the marketplace. He has been in the forefront of community development. His wife explained it best: "It has been with great sacrifices that we have brought up our family, acquired our home, and reared our children * * *. It has also been with great sacrifices that my husband has established his law office."

Whatever Ramon Irizarry's flaws are, they are not irreparable. *Cf. In re Templeton*, 99 *N.J.* 365, 492 *A.*2d 1001 (1985) (adopting DRB's recommendation of five-year conditional suspension of attorney).

Justice STEIN joins in this opinion.

*For Disbarment*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, GARIBALDI and COLEMAN—5.

*For Suspension*—Justices O'HERN and STEIN—2.

## ORDER

It is ORDERED that **RAMON A. IRIZARRY** of **NEWARK**, who was admitted to the bar of this State in 1980, and who was thereafter temporarily suspended from practice by Order of the Court dated July 17, 1990, and who remains suspended at this time, be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that **RAMON A. IRIZARRY** be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that **RAMON A. IRIZARRY** comply with *Rule* 1:20–20, dealing with disbarred attorneys; and it is further

ORDERED that **RAMON A. IRIZARRY** reimburse the Disciplinary Oversight Committee for appropriate administrative costs.