714 A.2d 233

IN THE MATTER OF RANDEE POMERANTZ,
AN ATTORNEY AT LAW.

Argued June 16, 1998—Decided July 17, 1998.

*Brian D. Gillet,* Deputy Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Andrew B. Schultz,* a member of the New York bar, argued the cause for respondent (*Michael S. Kimm,* attorney).

PER CURIAM.

Respondent was admitted to the bar of New Jersey in 1986. In 1995, the District XIV Ethics Committee (DEC) charged respondent with five counts of knowing misappropriation of client trust funds, *R.P.C.* 1.15, 8.4(c), failure to make prompt payment of funds, *R.P.C.* 1.15(b), two counts of commingling personal funds with attorney trust account funds, *R.* 1:21–6, misrepresentation and fraud, *R.P.C.* 1.15(a), 8.4(c), and failing to keep the records required by *Rule* 1:21–6(b) and (c), *R.P.C.* 1.15(d). The matter was referred to a Special Master.

The Special Master found that respondent failed to keep required records in violation of *R.P.C.* 1.15(d), commingled funds in violation of *R.P.C.* 1.15(a), and violated *R.P.C.* 8.4(c) defining as professional misconduct "conduct involving dishonesty, fraud, deceit or misrepresentation." The Special Master concluded, however, that respondent's misappropriation of funds was negligent, not knowing, and therefore recommended a three-year suspension rather than disbarment. The Disciplinary Review Board (DRB), on the other hand, determined that respondent committed knowing misappropriation of client funds and consequently recommended disbarment by a vote of seven to two. We agree that the record clearly and convincingly establishes that, among other violations, respondent knowingly misappropriated client funds. Therefore, we adopt the recommendation of the DRB and order that respondent be disbarred.

## I

Respondent first came to the attention of the Office of Attorney Ethics (OAE) when respondent's bank, First Fidelity, sent two

letters to the OAE on May 4, 1992 indicating that respondent's trust account had been overdrawn on two occasions. First, on April 14, 1992, a shortage of $1,213.59 occurred when a $1,353 deposit was not credited until the next business day. The second overdraft occurred on April 20, 1992, when a check was returned for insufficient funds, creating an overdraft in the amount of $875.43.

On May 21, 1992, the OAE contacted respondent, requesting that within ten business days respondent provide a written, documented explanation including copies of particular documents. In a letter dated July 7, 1992, respondent explained:

> We represent a client who has been in good standing with us for several years. In order to help them [sic] with a debt consolidation, we were paying debts for them [sic] through our Attorney Trust Account. Our client would first deposit the necessary monies into our account and we would draw the necessary checks. One local creditor of our client went directly to the bank, in spite of a dated check. Unfortunately, our client's check deposit bounced causing the overdraft.

The OAE was not satisfied with this explanation and requested additional documentation on July 13, 1992. Respondent's accountant, Patrick M. Walsh, sent copies of some of the requested documents to the OAE. The OAE was still unsatisfied and scheduled a demand audit of respondent's books and records, explaining to her that "[i]t appears from the records submitted that you were out of trust." The September 30, 1992 audit disclosed many problems with respondent's trust account.

After conducting a *de novo* examination of the record, we adopt the factual findings made by the DRB:

### The Zall Matter

> This count of the complaint charged respondent with knowing misappropriation of client funds [*RPC* 1.15(a) and *RPC* 8.4(c) ] and with failure to make prompt payment of funds [*RPC* 1.15(b) ].

> Barbara Zall retained respondent to represent her in a divorce proceeding. At a hearing on February 10, 1992, the parties placed on the record the terms of a settlement agreement. The final judgment of divorce, entered on March 19, 1992, required respondent to disburse from her trust account $22,547.49 to Zall and $10,000 to the attorney for the husband. On February 20, 1992, ten days after the final hearing and about one month before the entry of the final judgment of divorce, respondent sent the husband's attorney a proposed form of judgment, as

well as a trust account check for $10,000 for the husband's share of equitable distribution. Respondent did not disburse the $22,000 to Zall until April 6, 1992, eighteen days after the date of the final judgment of divorce, thereby raising a suspicion that, in the interim, the *Zall* funds had not been kept intact in her trust account. The circumstances surrounding the payment to Zall were hotly contested at the ethics hearing.

According to Patty Wooster, respondent's former paralegal assistant, and Catherine Cromlish (a/k/a Catherine Tzounkas), respondent's former bookkeeper, Zall called the office almost every day asking for her funds. Cromlish testified that in March 1992, when respondent was in Florida, respondent told Cromlish that Zall would be paid when respondent returned to New Jersey. According to Cromlish, she discovered that respondent's trust account had insufficient funds to pay Zall and so informed respondent during at least two telephone conversations. Cromlish testified that one of these conversations took place when respondent was in Florida. Cromlish testified further that respondent told her not to worry about the account, assuring her that enough funds would be available to pay Zall.

On March 26, 1992 respondent wrote a check to Zall. As noted earlier, she did not send the check to Zall, however, until April 6, 1992, eighteen days after the date of the final judgment of divorce. It was this check that triggered one of the overdrafts in respondent's trust account, prompting her bank, First Fidelity, to write to the OAE.

Respondent did not dispute that she was out-of-trust. She blamed the problem on poor accounting practices and, in particular, on her bookkeeper's failure to maintain proper records. In essence, thus, respondent contended that the use of other clients funds had been inadvertent.

As to the delay in the distribution to Zall, respondent testified that the reason for such delay was twofold. First, respondent explained, it was her practice not to distribute funds in divorce cases until she had received the final judgment of divorce with a "raised seal;" she added that she was waiting to receive that document to send the funds to Zall. Respondent acknowledged that she deviated from this practice when she distributed the $10,000 funds to the attorney for Zall's husband. She claimed, however, that she and the attorney had agreed that the payment would be made before the execution of the divorce documents. The second reason for the delay, respondent asserted, was that she wanted to wait until her return from Florida to send a check to Zall. When pressed by the presenter for documentary proof of her trip to Florida, such as an airline ticket, respondent was unable to produce any.

Respondent testified that she still represents Zall, who has never complained about her services.

The OAE presenter, in turn, charged that respondent deliberately delayed the disbursement to Zall because respondent knew that, due to her personal expenditures, her trust account did not have sufficient funds to pay Zall. In fact, the OAE charged, on April 10, 1992, four days before the check was dishonored, respondent already knew that her trust account was overdrawn. And she knew it, the OAE argued, because on April 10, 1992 she deposited $3,500 of her own funds into the trust account to cover a shortage in another matter, *Danmor*. According to the

OAE, this deposit proved that respondent actually knew much more about her trust account balances than she admitted knowing.

The OAE investigative auditor, Barbara Galati, testified that, on twenty separate occasions between October 23, 1991 and April 14, 1992, when the *Zall* check was presented for payment, respondent's trust account contained less than the amount required to be on deposit for the *Zall* matter alone. Moreover, according to Galati, from the date the check was written, March 26, 1992, until it was presented for payment, April 14, 1992, there were not enough funds on deposit in respondent's trust account to cover the disbursement to Zall. Galati testified that the trust account shortages were caused by respondent's use of trust funds to make payments unrelated to the *Zall* matter. Among the payees were: another client, Ronnie D'Esposito; respondent's minor daughters' bank accounts; contractors performing work on respondent's house; respondent's housekeeper; the owner of the building where respondent's husband conducted his business; respondent's husband's business; Freehold Mitsubishi, from whom respondent bought a car; and respondent herself.

The OAE presenter also took the position that, despite respondent's and Cromlish's testimony, respondent was not in Florida during March 1992. The presenter relied on the absence of any documentary proof of that trip. The presenter also pointed to numerous checks signed by respondent during the month of March. The presenter charged that such checks showed one of two things: either respondent was in New Jersey in March or she improperly signed the checks in blank.

### The Schneeberg Matter

This count of the complaint charged respondent with knowing misappropriation of client funds, in violation of *RPC* 1.15(a) and *RPC* 8.4(c), and with commingling of personal funds and trust funds, in violation of *R.* 1:21-6.

In November 1991 respondent's father, Sidney Schneeberg, passed away, leaving respondent as the sole beneficiary and executrix of his estate. From time to time, respondent would receive installment distributions from the estate. Instead of opening a separate bank account for the estate, she would deposit the funds in her trust account. Respondent told OAE auditor Galati that she used her trust account because it was easier to keep track of the payments and deposits in connection with the estate. The total periodic distributions for the estate amounted to $370,000. It is undisputed that respondent was entitled to such funds. The alleged ethics impropriety consisted of respondent's commingling the estate funds and trust funds and withdrawing funds in excess of those deposited for the estate. According to OAE auditor Galati, on nine occasions between November 18, 1991, the date of the deposit of the first estate distribution, and September 1992, the date of the last entry on the estate ledger card, respondent withdrew more than the funds on deposit for the estate, thereby invading client trust funds.

Respondent did not deny that she was out-of-trust. In fact, the account reconciliations prepared by respondent's accountant after the OAE notice of the demand audit, showed that respondent had invaded client funds. Respondent

claimed, however, that such invasion had been inadvertent, due to poor recordkeeping. Respondent attempted to shift the blame to her bookkeeper, Catherine Cromlish, contending that she had entrusted Cromlish with the responsibility of maintaining the estate account. Cromlish, in turn, testified that respondent knew at all times the exact balance of the estate account and that she, Cromlish, always followed respondent's directions on how much to withdraw from the account. According to Cromlish, respondent asked her constantly, sometimes daily, about the balance in the estate account. Cromlish pointed out that the *Schneeberg* ledger card contained entries made by respondent herself. Hence, Cromlish suggested, respondent had to be aware of the status of the account and, therefore, that the withdrawals exceeded the amount of funds on deposit. In fact, Cromlish testified, respondent was aware that at times the estate account had a negative balance. Cromlish also testified that, whenever she brought this problem to respondent's attention, respondent appeared unconcerned and assured her that there would be additional distributions from the estate.

The OAE's position was that respondent knew the precise balance of the estate account and that she, therefore, knowingly invaded client funds. For example, the OAE pointed out, on January 2, 1992 respondent made the largest deposit of funds toward the *Schneeberg* account, $171,823.59. On that same day, respondent wrote seventeen checks against her trust account, totaling $171,823.48, or eleven cents less than the funds on deposit for the estate. The OAE urged a finding that respondent could not have written a large number of checks (seventeen) and have come within only a few cents of its balance without knowing the exact balance of the account.

Toward the end of the ethics hearing, the OAE presenter introduced a new theory as to why respondent had deposited the estate funds in her trust account. The OAE presented evidence that several judgments had been entered against respondent and her husband, following their default on loans for medical equipment for the husband's business. According to OAE, respondent deposited the $370,000 inheritance in her trust account to shelter the funds from judgment-creditors.

### The D'Esposito Matter

This count charged respondent with knowing misappropriation of client funds, in violation of *RPC* 1.15(a) and *RPC* 8.4(c).

During the demand audit, the OAE auditor noticed that a client ledger card for Ronnie D'Esposito showed only one transaction, a $1,460 disbursement to the client on October 30, 1991. The OAE then asked respondent for a prior ledger card, on which a $1,460 deposit should have been recorded. In response to the OAE's inquiry, respondent sent a reconstructed ledger card showing the receipt of a $1,500 partial retainer on June 24, 1991, a payment of $135 on July 3, 1991 to the Superior Court of New Jersey and the $1,460 payment to D'Esposito on October 30, 1991.[1] As additional explanation for the *D'Esposito* disbursement, on May 8,

---

[1] Although the disbursements exceeded the $1,500 partial retainer by $95, that is not the focus of the OAE's charge of knowing misappropriation. The disbursement of the $1,460 is the essence of that charge.

1996 respondent's counsel sent certain documents and a letter to the OAE, which in part stated as follows:

> Based on these documents, I am advised by Randee that her intention was to refund the sum of $1,460.33 to her client Ronnie D'Esposito, as an unused portion of the previously-paid retainer from Ms. D'Esposito.

> According to Ms. Pomerantz, the $1,460 check should have been paid from the regular [business] account on October 31, 1991, but was inadvertently and negligently instead paid from the trust account. It may be noted that Randee's father died on November 1, 1991 after being in and out of a comatose condition for several days.

Neither respondent nor her counsel offered any further explanation for respondent's alleged inadvertence. Included with the above letter were copies of a $2,000 check dated June 24, 1991 from D'Esposito to respondent, a $1,500 check dated June 28, 1991 from D'Esposito to respondent and respondent's business account bank statement for October 1991.

At the hearing before the special master, the OAE auditor testified that, although counsel's letter to the OAE indicated that the $1,460 refund to D'Esposito on October 30, 1991 had been mistakenly made from the trust account instead of the business account, on the day of the refund, October 30, 1991, the business account had only $1,216.66 on deposit, or $243.34 less than $1,460. The OAE auditor further testified that, although the *D'Esposito* ledger card contained a deposit entry of $1,500 on June 24, 1991, there was no source document, such as a deposit slip, showing that the $1,500 had been deposited in respondent's trust account. Accordingly, the OAE auditor concluded, because respondent had made the *D'Esposito* disbursement from the trust account without corresponding funds on deposit, other client trust funds had necessarily been invaded. According to the OAE, such misappropriation was knowing, as respondent knew that she had insufficient funds in her business account to issue a refund check to D'Esposito.

For her part, respondent testified that she had deposited the $3,500 retainer received from D'Esposito in her business account. Respondent could not explain why she had issued the refund check from the trust account instead of the business account. To refute the OAE's contention that her motive for issuing a trust account check was a low balance in her business account, respondent contended that the business account bank statement for October 1991 showed a deposit of several thousand dollars on October 31, 1991, one day after the $1,460 check was issued. Therefore, respondent argued, had she written the refund check against the business account, there would have been sufficient funds to cover the amount of the check at the time of its presentation for payment.

### The "Out–of–Trust" Matter

This count charged respondent with knowing misappropriation of client funds, in violation of *RPC* 1.15(a) and *RPC* 8.4(c).

OAE auditor Galati testified that, on twenty-eight occasions from June 13, 1991 to August 14, 1992, respondent's trust account was out-of-trust, that is, there was not enough on deposit to equal the funds that respondent should have been holding

for her clients. Galati prepared a chart showing each out-of-trust instance and the client's funds that were invaded. Before preparing the chart, Galati obtained information from client ledger cards, as reconstructed by a trust analyzer software program, using source documents such as canceled checks, deposit slips, checkbook stubs and the end-of month reconciliation statements prepared by respondent's accountant. According to the chart, during this fourteen-month audit period, the shortages in respondent's trust account ranged from $987.60 to $12,046.38, resulting in the invasion of trust funds held in behalf of fifteen different clients.

Respondent denied that she knowingly misappropriated client funds, attributing the invasion of those funds to negligent recordkeeping.

## The Danmor Matter

In this count, too, respondent was charged with knowing misappropriation of client funds, in violation of RPC 1.15(a) and RPC 8.4(c).

Respondent's husband, Allen Pomerantz, is a physician who operated a radiology practice known as Danmor, Inc. Because his rental payment checks were often returned for insufficient funds, Pomerantz's landlord, Bruce Frankel, required him to pay the $1,108 weekly rent by cash or certified check. In March 1992, after Pomerantz continued to make untimely rent payments, respondent announced to Frankel that she was assuming responsibility for Danmor's financial affairs. Respondent declared that she would pay Danmor's rent from her trust account, which she described as being "good as gold."

During March and April 1992 respondent wrote trust account checks for Danmor's rent, in the amount of $1,108 each. She also wrote weekly checks in the amount of $245 against the Danmor account. These checks were made payable to cash and contained the reference "Angel" in the memo column. Angel Bretney was respondent's housekeeper. Respondent had an arrangement with her husband whereby Danmor would give respondent a check for $1,353 every week, which respondent would deposit in her trust account to pay the landlord and Angel.

On April 20, 1992 respondent's trust account check number 1609, payable to the landlord, was dishonored. After Danmor's check to respondent was returned for insufficient funds, First Fidelity Bank contacted the OAE. In response to the OAE's inquiry, respondent offered the explanation discussed above, that is, that she had been helping a client with a "debt consolidation" and that, "in spite of a dated check," a creditor had gone directly to a bank, causing the client's check to "bounce." Respondent did not disclose that the client was her husband. OAE auditor Galati testified that, at the demand audit, she had asked respondent who Danmor was. According to Galati, respondent replied that Danmor was a very good client, never offering that Danmor was owned by her husband. Respondent, in turn, countered that she would have disclosed her husband's interest in Danmor if the OAE had asked her about Danmor.

. . . .

Respondent admitted her arrangement with Danmor. In her answer, she acknowledged that she was negligent in agreeing to this procedure, rather than suggesting that Danmor pay rent with its own certified funds. Respondent further conceded that, because Danmor's checks to her were returned for insufficient funds, a "temporary shortfall" occurred in her trust account, which she then remedied by depositing personal funds in the account. Indeed, on April 10, 1992 respondent deposited into her trust account $500 from her business account and $3,000 from her personal account, followed by another $1,500 from her personal account on April 24, 1992. The [first two] deposit[s] bore the notation "loan to trust—Danmor" [and the latter bore the notation "loans"].

Galati testified that, at the demand audit, she had asked respondent who Angel was. According to Galati, respondent had identified the person as Angel Bretney, a creditor of Danmor, claiming to know no more than that or the reason why Angel was paid in cash. At the ethics hearing, respondent denied having been specifically asked about Angel and asserted that she would have given more information if asked.

Respondent's alleged misrepresentations on the identity of Danmor and Angel were the subject of a charge of a violation of RPC 8.4(c).

## Recordkeeping Violations

The complaint charged respondent with the following fourteen recordkeeping violations: a cash receipts journal was not maintained for the trust account or for the business account; a cash disbursements journal was not maintained for the attorney trust account; a running cash balance was not maintained in the computerized attorney business account cash disbursements journals reconstructed by respondent's accountant; seventy-four attorney trust account checks from November 20, 1991 to July 30, 1992 did not have client references; a client ledger card was not maintained for bank charges of $234.82 from December 13, 1991 to June 3, 1992; twenty-one deposit slips from November 20, 1991 to July 30, 1992 did not have client references; small client balances were carried on client ledger cards for excessive periods of time; no quarterly or monthly reconciliations were prepared; from November 21, 1991 through July 30, 1992 eighteen trust account checks, totaling $13,655.97, were made payable to cash; not all attorney fees were deposited in respondent's attorney business account; personal funds and trust funds were commingled; transactions for one client were incorrectly entered on the client ledger card of other clients; client ledger cards did not accurately reflect the transactions as they occurred; and trust account checks were post-dated, as admitted by respondent in her July 7, 1992 letter to the OAE.

Respondent told the OAE that she thought her bookkeeper, Catherine Cromlish, had prepared the trust account reconciliations, although respondent admitted that she had never requested them or seen them. Respondent also accused Cromlish of stealing the cash disbursements and cash receipts journals. Galati and Cromlish testified, however, that those journals never existed.

Of particular note to the OAE was a check for attorney fees that respondent deposited in her trust account instead of her business account. On March 16, 1992 respondent deposited into her trust account $20,300 from Temi Frank, a client. Respondent then disbursed those funds to herself the next day. Respondent's records showed that the $20,300 deposit was recorded on two client ledger cards: the *Schneeberg estate* card, and a "reconstructed" ledger card for Temi Frank. The *Frank* card had been reconstructed because there was no original client ledger card. The OAE urged a finding that respondent's deposit of the *Frank* funds into the trust account was intended to cover the trust account check to Barbara Zall, as respondent was aware of the shortage in her trust account. Obviously, the crediting of one deposit on two different client ledger cards was improper.

The record is replete with numerous other questionable office practices by respondent. Respondent admitted that she went to her office only about once a week. On other days, she did not go inside, but sat in her car in the office parking lot, while her staff brought her checks and paperwork to sign. Respondent's frequent absences from the office also led to her authorizing her staff to sign her name on trust account and business account checks. Cromlish, Patty Wooster (a former paralegal assistant) and Kathleen Kurpiel (a former paralegal) testified that respondent had permitted Cromlish to sign respondent's name on numerous checks. In fact, respondent's method of paying her staff every week was to have Cromlish prepare, sign, endorse and cash the checks at the bank, returning with cash for each employees' salary plus respondent's own draw.

Respondent, in turn, vigorously denied authorizing Cromlish or any other person to sign trust account checks. She was equivocal about whether she had authorized Cromlish to sign business account checks, except for a period of one week and then only to pay office bills.

At the ethics hearing, when respondent was shown checks that she clearly had not signed, instead of conceding that they had been signed by another person, respondent attributed the difference to a "movement" in the check.

Respondent admitted, though, that she signed trust account checks in blank:

Q: Did you sign checks in blank?

A: It looks like I must have.

Mr. Barger: As a practice did you?

A: I shouldn't have. I really don't remember going now—I don't now [sic].

Mr. Barger: Not whether you should have, or even as a general practice, did you at times sign the checks in blank?

A: I would have to say looking at the mess I did I could have.

Mr. Barger: And might this have been one of them?

A: Yes, it could have. It is a terrible thing to say, but I could have.

Mr. Barger: So you did sign trust account checks in blank?

A: It is very possible. I wish I could go back. I can't.

\*     \*     \*

A troubling event took place just before the first scheduled ethics hearing date. The hearing was scheduled for Monday, May 13, 1996. On Friday, May 10, 1996, respondent signed a certification alleging that Cromlish had forged her signature on checks and had stolen funds from her. Respondent referred the matter to the Monmouth County Prosecutor's Office. A grand jury proceeding ensued. At its conclusion, a protective order on the transcripts of the proceedings was entered. The parties advised the Board that the grand jury returned a no bill on respondent's criminal complaint.

At the ethics hearing, Galati testified that respondent "actually told us on the day of the audit, that she found out subsequently that no funds were stolen."

Another unsettling revelation was Cromlish and Wooster's testimony that they had left respondent's employ because respondent had directed them to "backdate" papers to be filed in court, which they had refused to do.

At the ethics hearing, a lot of attention was focused on several checks from respondent's trust and business accounts. Specifically, Cromlish testified that respondent had asked her to travel to Florida to remove items from the condominium owned by respondent's father. Cromlish agreed. She drove to Florida in a car rented by respondent. According to Cromlish, although respondent had agreed to reimburse her for expenses, they had a dispute about the reimbursement. Cromlish testified that ultimately, on March 11, 1992, respondent gave her a reimbursement check for $385.97, issued against the trust account. Cromlish used the proceeds from that check to purchase three money orders to pay personal expenses.

Respondent, however, accused Cromlish of forging the March 11, 1992 check for $385.97 and improperly retaining the proceeds for her personal use. According to respondent, on February 7, 1992 she reimbursed Cromlish with business account check number 2112 for $412.32, payable to cash. Respondent, however, claimed that it was unlikely that Cromlish's three bills plus the bank service charges for issuing the three money orders would have equaled the exact amount of Cromlish's requested reimbursement of $385.97. On the other hand, the presenter pointed out that on February 6, 1992 respondent issued business account check number 2062 to Jaguar of Westfield in the amount of $412.32, the exact amount of the business account check number 2112 issued eight days later, payable to cash. After the presenter suggested that respondent had paid Jaguar of Westfield out of the business account and then issued another check in the same amount to reimburse herself for that expense, respondent insisted that check number 2112 had been paid to Cromlish as reimbursement for the Florida trip. Cromlish could not recall whether she had received those funds.

By way of explanation for her trust account improprieties, respondent testified that she had experienced the loss of several family members in a short period of time. Respondent stated that she lost her mother in January 1990, her brother in February 1991, her father in November 1991 and her mother-in-law in December 1991. In addition, respondent testified, she had been injured in an automobile accident in April 1991. Respondent also blamed others for her ethics infractions, particularly her recordkeeping violations. Respondent claimed that it was Cromlish's responsibility to maintain the necessary books and records in order to

reconcile the accounts. Respondent faulted her accountant as well, asserting that it was his responsibility to take care of her books. Respondent admitted, however, that she never discussed her financial affairs or the requirements of *R.* 1:21–6 with the accountant. Respondent also remarked that, when she was admitted to the bar in 1986, there was no requirement that she complete an accounting course.

We have carefully canvassed the record, mindful of our duty to make *de novo* findings of fact based on clear and convincing evidence, and are in complete agreement with the findings of the DRB. The findings recited above we adopt as our own.

## II

This Court has held that ordinarily, when an attorney uses his or her clients' money as if it were the attorney's own, that attorney will be disbarred. *In re Wilson,* 81 *N.J.* 451, 453, 409 *A.*2d 1153 (1979). The Court has further stated: "We foresee no significant exceptions to this rule and expect the result to be almost invariable." *Ibid.*

Respondent knowingly used her client's funds for her own purposes without authorization. Her juggling of funds between her personal, business, and trust accounts belies her claimed lack of knowledge that she was out-of-trust. Respondent's behavior demonstrates that she was aware of shortfalls in her accounts. For example, respondent paid D'Esposito from the trust account rather than the business account when the business account did not contain enough money to cover the amount due D'Esposito. We have previously observed that when an attorney makes a loan to a deficient trust account, it indicates that the attorney may be "personally aware on that date that his handling of the trust account had produced the deficit result." *In re Skevin,* 104 *N.J.* 476, 486, 517 *A.*2d 852 (1986), *cert. denied,* 481 *U.S.* 1028, 107 *S.Ct.* 1954, 95 *L. Ed.*2d 526 (1987). Similarly, respondent's so-called loans to the trust account evince her knowledge that she was out-of-trust.

The *Wilson* automatic disbarment rule is largely based on the trust a client must have in an attorney handling client funds. The Court explained:

> It is a trust built on centuries of honesty and faithfulness. Sometimes it is reinforced by personal knowledge of a particular lawyer's integrity or a firm's reputation. The underlying faith, however, is in the legal profession, the bar as an institution. No other explanation can account for clients' customary willingness to entrust their funds to relative strangers simply because they are lawyers.
>
> [*Wilson, supra*, 81 *N.J.* at 455, 409 *A*.2d 1153.]

When respondent knowingly dipped into her trust account for personal expenses, she violated that trust. "[T]he principal reason for discipline is to preserve the confidence of the public in the integrity and trustworthiness of lawyers in general." *Id.* at 456, 409 *A*.2d 1153.

Although respondent may have intended to replace the funds she took from the trust account, she placed funds in jeopardy when she allowed her account to become out-of-trust. She delayed payment to Barbara Zall because respondent had not returned funds to the trust account at the time Zall was entitled to payment. That respondent may not have intended to permanently deprive Zall of her money and that respondent intended to replace the funds are irrelevant. *See In re Irizarry*, 141 *N.J.* 189, 192, 661 *A*.2d 275 (1995) (stating " 'a lawyer's subjective intent, whether it be to 'borrow' or to steal, is irrelevant to the determination of the appropriate discipline in a misappropriation case' " (quoting *In re Warhaftig*, 106 *N.J.* 529, 533, 524 *A*.2d 398 (1987))); *In re Noonan*, 102 *N.J.* 157, 160, 506 *A*.2d 722 (1986) (stating "[i]t makes no difference whether ... the lawyer intended to return the money when he took it, .... it is the mere act of taking your client's money knowing that you have no authority to do so that requires disbarment").

We have consistently failed to attach much, if any, importance to restitution " 'because that may depend more upon financial ability or other favoring circumstances than repentance or reformation.' " *Wilson, supra*, 81 *N.J.* at 457, 409 *A*.2d 1153 (quoting *In re Harris*, 88 *N.J.L.* 18, 22–23, 95 *A.* 761 (Sup.Ct.1915)). Furthermore, "borrowing" client funds from a trust account puts those funds and other client funds at great risk: misappropriation may occur with the intent to repay, but then "[a]nticipated money

for repayment fails to materialize. Other clients' trust funds are then used for 'restitution,' and the initial embezzlement spawns many more." *Id.* at 458–59, 409 *A.*2d 1153.

In *Skevin, supra,* the respondent asserted that he deposited his own funds in his trust account to cover personal withdrawals. There, the respondent admitted assuming there was enough money in the trust account and not maintaining an accounting or running balance of his own funds in the trust account. *Skevin, supra,* 104 *N.J.* at 485, 517 *A.*2d 852. We observed that "it follows that each [ ] advance [the attorney gave himself] posed an at least realistic likelihood of invading the accounts of another client since respondent had no way of knowing what the balances were." *Ibid.* In addition to the *Zall* matter, respondent's withdrawal from the *Schneeberg* funds, even though she was personally entitled to those funds, placed other trust funds in jeopardy because respondent was not aware of the precise balance of the *Schneeberg* funds at all times. Indeed, she did invade client funds as the balance in her account was often lower than the amount she should have been holding in trust for her clients. Her use of the trust account to hold the *Schneeberg* funds not only constituted improper commingling, but it caused client funds to be invaded.

In *Skevin,* we also noted that where an attorney "knew the invasion [of client funds] was a likely result of his conduct, a state of mind consistent with the definition of knowledge in our statute law" results. *Id.* at 486, 517 *A.*2d 852. Therefore, even if we accept respondent's contentions that she was unaware that she was out-of-trust, her "willful blindness" satisfies us that she knowingly misappropriated client funds. *Ibid.* "[A] knowing misappropriation may be established by 'evidence [that] clearly and convincingly demonstrates that [respondent] knew the invasion was a likely result of [her] conduct.'" *Irizarry, supra,* 141 *N.J.* at 194, 661 *A.*2d 275 (quoting *Skevin, supra,* 104 *N.J.* at 486, 517 *A.*2d 852). Based on the *Irizarry* and *Skevin* principles, respondent knowingly misappropriated client funds.

Respondent blames her bookkeeper and accountant for being out-of-trust. The fact that respondent may have permitted her bookkeeper to sign checks drawn on the trust account does not mitigate the seriousness of her breach of professional responsibility. "Lawyers may not absolve themselves of the misappropriation of client funds by delegating to employees the authority to complete signed checks and then failing to supervise these employees." *Irizarry, supra,* 141 *N.J.* at 193, 661 *A.*2d 275. Respondent's duty to protect her client's funds was nondelegable. *Ibid.* As we observed in another case, "[w]e are not confronted here with an isolated or even an occasional bookkeeping mistake .... Lawyers have a duty to assure that their accounting practices are sufficient to prevent misappropriation of trust funds." *In re Fleischer,* 102 *N.J.* 440, 447, 508 *A.*2d 1115 (1986).

Respondent's payment of Danmor's rent and her housekeeper from the trust account was completely inappropriate and constitutes other knowing misappropriations of client funds for personal use. Moreover, respondent's failure to disclose the true nature of her relationship with Danmor and Angel Bretney support an inference that she was aware of the misappropriation. In addition, her failure to inform the OAE constitutes a violation of *R.P.C.* 8.4(c) as "conduct involving dishonesty, fraud, deceit or misrepresentation."

Finally, we are greatly troubled by respondent's allegations of theft and forgery against her bookkeeper, Cromlish. In that connection, the DRB observed:

Respondent went so far as denouncing Cromlish's conduct to the prosecutor's office, who presented the matter to a grand jury that did not indict Cromlish. In fact, respondent herself confessed to the OAE at the demand audit that she had been mistaken: no funds had been stolen. Respondent's groundless accusations, obviously intended to exonerate her of any responsibility and to impugn the good character and integrity of a party whom she knew to be innocent, evokes shades of a troubling case recently decided by the Court, where the attorney received a three-year suspension for grievous misconduct, which included false accusations against a young woman, her babysitter. Two members of the Court dissented, voting for disbarment. *In re Kornreich,* 149 *N.J.* 346, 693 *A.*2d 877 (1997). As in *Kornreich,* respondent's malicious denigration of an innocent party's good name should not be tolerated.

Presenting a false claim to a grand jury is not only alarming, but represents an attempt to obstruct justice in that respondent intended to let an innocent person take the fall for her misdeeds. This was but another instance of respondent's repeated dishonesty. Presenting a false or phony claim to a grand jury is a perversion of the justice system. When an attorney attempts to frame an innocent person in a criminal act, that attorney has demonstrated contempt for the administration of justice and has poisoned the well of justice. *In re Verdiramo*, 96 *N.J.* 183, 186, 475 *A.*2d 45 (1984).

We conclude based on clear and convincing evidence that respondent has flagrantly disregarded the rules of professional conduct and "the honor and integrity demanded of a member of the bar in the practice of law." *In re Pennica*, 36 *N.J.* 401, 423, 177 *A.*2d 721 (1962). That evidence also clearly and convincingly establishes that respondent knowingly misappropriated client funds, a clear violation of the *Wilson* rule. We are therefore convinced that respondent is no longer worthy of the Court's endorsement as being fit to practice law in this State and should be disbarred.

## III

We order the disbarment of respondent. Respondent shall reimburse the Disciplinary Oversight Committee for appropriate administrative costs.

*For disbarment*—Chief Justice PORITZ, and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.